681 F.2d 186
 10 Fed. R. Evid. Serv. 1201
 Richard ARNOLD, IV, Appellee,
v.
EASTERN AIR LINES, INC., Appellant,
v.
UNITED STATES of America, Appellee.
Francis C. MIHALEK, Appellee,
v.
EASTERN AIR LINES, INC., Appellant,
v.
UNITED STATES of America, Appellee.
Helen Rae WESTON, as Executrix of the Estate of Lewis M.
Weston, deceased, Appellee,
v.
EASTERN AIR LINES, INC., Appellant.
The AETNA CASUALTY AND SURETY COMPANY; Aetna Insurance
Company; American Empire Insurance Company; Commercial Union
Insurance Company; Compagnies D'Assurances Du Groupe;
Concorde; Continental Casualty Company; Employers Mutual
Liability Insurance Company of Wisconsin; Hartford Fire
Insurance Company; Industrial Indemnity Company; Maryland
Casualty Company; Reliance Insurance Company; Royal
Indemnity Company; St. Paul Fire and Marine Insurance
Company; Security Insurance Company of Hartford; The
Travelers Indemnity Company; Underwriters at Lloyd's and
Associated British Insurance Companies; United States
Fidelity and Guaranty Company; United States Fire Insurance
Company; Zurich Insurance Company, Appellants,
v.
UNITED STATES of America; Bernard C. Groseclose; Alden E.
Hare; William L. Hogan; Dennis L. Hunter, Appellees.
 Nos. 80-1245 to 80-1247 and 80-1334.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 2, 1981.
Decided June 4, 1982.
 
 William C. Raper, Winston-Salem, N. C. (H. Grady Barnhill, Jr., Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on brief), for appellant Eastern Air Lines, Inc.
 Walter E. Rutherford, New York City, for appellants Aetna Casualty and Surety Co., et al.
 Gary S. Hemric, William K. Diehl, Jr., Charlotte, N. C. (Robert H. Sheppard, James McElroy & Diehl, P.A., Charlotte, N. C., on brief), and Robert R. Smiley, III, Washington, D. C. (Smiley, Murphy, Olson & Gilman, Washington, D. C., on brief), for appellees Richard Arnold, IV, Francis C. Mihalek and Helen Rae Weston.
 Michael J. Pangia, Asst. Chief Counsel, Litigation Div., F. A. A., Washington, D. C., for appellees Groseclose, Hare, Hogan, Hunter, and United States of America.
 Before BRYAN, Senior Circuit Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 These consolidated appeals grow out of the crash of Eastern Airlines Flight No. 212 near Charlotte, North Carolina on September 11, 1974, which resulted in the deaths of 69 passengers and 2 crew members and serious personal injuries to 9 passengers and 2 crew members who survived. Four resulting lawsuits consolidated for trial generate these appeals. In Nos. 80-1245, 80-1246, and 80-1247, respectively, Eastern Airlines (Eastern) appeals the award of compensatory damages aggregating over $4 million to surviving passengers Arnold and Mihalek and the award of wrongful death damages of $797,000 to the personal representative of deceased passenger Weston, and in Nos. 80-1245 and 80-1246, Eastern appeals the denial of its third party claims for contribution against the United States of America in respect of the Arnold and Mihalek personal injury actions. In No. 80-1334 The Aetna Casualty and Surety Company and other insurers of Eastern (Aetna) appeal the dismissal, following trial to the court and jury respectively, of their action against the United States and four individual air traffic controllers for contribution in respect of their out of court settlements of claims by or on behalf of other crash victims and of a property damage claim for destruction of the aircraft. We affirm the judgment in all respects save the award of wrongful death damages in the Weston action; as to that we find reversible error and remand for a new trial.
 
 
 2
 * Following the crash of Flight 212 the great bulk of the ensuing claims by and on behalf of surviving and deceased crash victims were settled out of court by Eastern's insurers. A total of around $22 million was paid in these settlements, and another $3,281,000 was paid in settlement of the aircraft owner's property damage claim.
 
 
 3
 Not all the claims were settled however. In March and September, 1976, respectively, surviving passengers-plaintiffs Arnold and Mihalek commenced diversity actions against Eastern in the United States District Court for the Western District of North Carolina seeking, on allegations of negligence, compensatory and punitive damages for their personal injuries. In September 1976, plaintiff Helen Weston as Executrix of the Estate of deceased passenger Lewis M. Weston, commenced a diversity action in the United States District Court for the District of South Carolina seeking, on allegations of negligence, compensatory and punitive damages for the wrongful death of her decedent. In the Arnold and Mihalek actions (but not the Weston action) Eastern impleaded the United States on allegations of the concurring negligence of certain government employees on duty as air traffic controllers at the time of the crash, and sought on this basis contribution from the government in respect of Eastern's potential liability. In its responsive pleadings to the personal injury and wrongful death claims Eastern admitted liability for compensatory damages[1] but denied liability for punitive damages.
 
 
 4
 In February 1977 Aetna and the other insurers of Eastern commenced an action in the United States District Court for the Western District of North Carolina against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 et seq., and against four federal air traffic controllers under North Carolina common law, alleging concurring negligence by these defendants and seeking on that basis contribution[2] in respect of amounts paid by the insurers in making the out of court settlements noted above.
 
 
 5
 After all four of these actions[3] had been transferred to the Charlotte Division of the Western District of North Carolina under the guidelines for complex and multi-district litigation, the district court, in early November 1977, sua sponte ordered them consolidated for discovery and trial, subject to reconsideration as to the trial aspect following the completion of discovery. Discovery then proceeded in the consolidated actions until mid-October, 1979. Shortly after completion of discovery Eastern and Aetna moved to sever the Aetna action for trial in order to avoid prejudice to Eastern. After considering alternative proposals respecting the appropriate procedure, the district court denied the motion for severance, and the consolidated actions proceeded to trial.
 
 
 6
 Following a three-week trial to court and jury,[4] the jury, after seventeen hours of deliberation, returned verdicts awarding substantial compensatory damages, but denying any punitive damages, on the Arnold, Mihalek and Weston claims and finding the air traffic controllers not liable on Aetna's claim for contribution. Arnold was awarded $3,027,500; Mihalek, $1,137,500; and Weston's representative, $847,000. Following briefing and argument of various post-trial motions by the parties, the district court declined to disturb the jury verdicts in any save one particular. On the Weston wrongful death verdict the court determined that it had erred in submitting pain and suffering to the jury as a compensable item of damages and, to correct this error, ordered a remittitur of $50,000, reducing the award to $797,000, which the plaintiff accepted. As so reduced, the court let this verdict stand. On Eastern's third party claim and Aetna's separate claim against the United States for contribution that were tried to the court non-jury, the court made findings of fact and conclusions of law against the claimants, finding the United States not liable for contribution on either claim.
 
 
 7
 From the final judgment in favor of the personal injury and wrongful death claimants on their claims and against Eastern and Aetna on their respective cross-claim and claim for contribution, Eastern and Aetna have appealed. They assign a number of errors, some commanding more discussion than others, to which we now turn. Further background facts and details of the proceedings will be developed as needed in discussing particular assignments of error.
 
 II
 
 8
 Eastern's three principal assignments of error-two of which are paralleled in Aetna's assignments-all relate ultimately to the amount of compensatory damages awarded in the personal injury and wrongful death actions. Though subject to independent analysis, the errors asserted are in the end so interrelated that we will discuss them as a discrete cluster.[5]
 
 
 9
 Both Eastern and Aetna complain first, in chronological terms, of the refusal of the court to sever the originally consolidated actions into two separate trial units: one consisting of the main claims against Eastern together with Eastern's two related third party claims for contribution against the United States; the other, of Aetna's action for contribution against the United States and the four individual air traffic controllers. Eastern claims that consolidated trials (the denial of severance) resulted in prejudicially inflated damage awards against it; Aetna, that it resulted in the introduction into its case of prejudicial irrelevances related to Eastern's culpability; and that indeed there were not between the two units sufficient common issues to permit consolidation under Rule 42(a).
 
 
 10
 Eastern and Aetna then join in complaining of grossly improper conduct by opposing counsel[6] in making comments and arguments directly to, and in the presence of, the jury. These, they claim, were not adequately corrected by the trial judge and, in consequence, resulted in demonstrable prejudice: to Eastern in the form of prejudicially inflated damage awards; to Aetna, by unfairly prejudicing the jury in respect of the bona fides of the insurers' claims for contribution.
 
 
 11
 Eastern additionally assigns as error the trial judge's refusal to set aside the damage awards as being excessive and the result, however excited, of passion and prejudice.
 
 
 12
 We take these in order and in combination.
 
 
 13
 * The proper starting point for assessing this cluster of assigned errors is the district court's decision to try these four actions and the third party claims incident to two of them as a single unit. This set the stage for all now challenged that followed.
 
 
 14
 Assessed for its independent effect upon the judgments appealed from, we find no reversible error in the decision to deny the motions to sever. The decision whether to sever or to consolidate whole actions or sub-units for trial is necessarily committed to trial court discretion. We review only to determine whether the discretion was abused, Bowie v. Sorrell, 209 F.2d 49, 51 (4th Cir. 1953); In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006, 1013 (5th Cir. 1977), and if so, whether prejudice resulted. Here we find no abuse.
 
 
 15
 When the motions to sever were made some twelve days before trial, Eastern and Aetna contended that a consolidated trial would necessarily prejudice both of them: Eastern, by the necessary revelation to the jury of the fact and apparent scope of its insurance coverage; Aetna, by allowing evidence of Eastern's allegedly gross culpability to influence the jury in deciding whether any other party should, in view of such gross culpability, share Eastern's (hence Aetna's) burden of liability. To avoid the predicted prejudice they suggested two alternative procedures. First, as a quid pro quo for severance of the Aetna action, Eastern would abandon its third party claims for contribution against the United States in the two passenger actions thereby foregoing in these actions at least any right of its insurers to contribution in respect of these two litigated claims. Alternatively, in a consolidated trial of all the actions, specific steps could be taken to screen from the jury any knowledge that Eastern had liability insurance coverage or that any settlements of other claims by its insurers had occurred. Counsel for Aetna and Eastern would be introduced as co-counsel for Eastern, no mention of liability insurance would be allowed, and the jury would be informed only of the interests involved in the passenger claims against Eastern and in Eastern's related third party claims for contribution.
 
 
 16
 The risks of prejudice and possible confusion as identified by the appellants were obvious ones which in the exercise of a sound judicial discretion the district court was obliged to weigh. See Molever v. Levenson, 539 F.2d 996 (4th Cir. 1976). Failure carefully to consider them and the alternative procedures advanced by appellants as a means of avoiding them may well have constituted an abuse of discretion. But the record shows that they were carefully weighed, both in absolute terms and in relation to countervailing considerations also necessary to sound decision. The critical question for the district court in the final analysis was whether the specific risks of prejudice and possible confusion were overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives. See Fed.R.Civ.P. 42; see generally 9 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2383 (1971).
 
 
 17
 In this case it could not seriously be contended that the purely logistical factors-time, expense, travel burdens, etc.-did not militate in favor of a consolidated trial. Eastern and Aetna have made no such claim. They focus instead primarily on the specific risks of prejudice posed to Eastern by the disclosure of its insurance coverage and to Aetna by evidence of Eastern's possibly gross culpability, and on the absence of any risk of inconsistent adjudications because of the asserted absence of any substantial common issues between the Aetna contribution action on the one hand and the passenger actions with their related third party contribution claims on the other.
 
 
 18
 Without here exploring the parties' opposing contentions on this point in the same detail that they have been advanced in both courts, it suffices to say that the district court did carefully assess them in detail in the process of making its determination not to sever the actions. We are satisfied that the discretion exercised was in consequence a sound one.
 
 
 19
 Gauging the possible prejudice to Eastern flowing from the disclosure of insurance coverage, the district court made a pragmatic assessment, one frequently made by federal courts, see, e.g., Tallant Transfer Co. v. Bingham, 216 F.2d 245, 247 (4th Cir. 1954), that under the specific circumstances of this case, it would simply be unrealistic to assume either that the jury did not know that insurance coverage existed or that, if it were known to exist, it would likely inflate any damage award made against a corporate defendant such as Eastern. Since liability for compensatory damages was not in issue this was essentially the limit of risk. Cf. Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 758 (3d Cir. 1976) (risk of imposing liability because of insurance coverage).
 
 
 20
 Assessing the possible prejudice to Aetna in its effort to obtain contribution from the government that would be created by revelation of Eastern's gross culpability and the details of the injuries suffered by the crash victims, the court recognized the risk and explicitly relied upon its ability to safeguard Aetna's interest by appropriate cautionary instructions. We agree that this is the sort of risk that a trial court may properly consider to be controllable by this means, and we are satisfied that the judgment that here it might be controlled was, in the event, borne out.[7]
 
 
 21
 Addressing the contention that there were no sufficient common issues between Aetna's contribution action and the main and third party contribution claims to warrant consolidation under Rule 42, the court correctly rejected it. Properly identified as substantial common issues were those of proximate causation necessarily involved in the passenger claims that Eastern's negligence proximately caused the crash, and Eastern's and Aetna's claims that the air traffic controllers' negligence concurred in causing it.[8] See, e.g., A/S Ludwig Mowinckles Rederi v. Tidewater Construction Corp., 559 F.2d 928 (4th Cir. 1977).
 
 
 22
 We are satisfied that at the time the district court made its ruling against severance, it did so reasonably and on the basis of a sound assessment of the proper factors, hence well within the bounds of the discretion committed to it.
 
 B
 
 23
 Eastern's major contention on appeal-another of those in which Aetna joins-relates to conduct of opposing counsel in making improper comments and arguments to the jury. So gross was this conduct, and so manifestly did it taint the jury verdicts, say the appellants, that only by setting the verdicts aside could the prejudice be cured. The district court failed, they say, properly to curb and contain its effects as it occurred and committed reversible error in declining on their post-trial motions to correct it by that ultimate means. Though the contention is a serious one that has been treated accordingly, we conclude that here too the district court properly acted within its discretion in declining on this ground to reject these verdicts.
 
 
 24
 Of the many details of trial management necessarily committed to broad trial court discretion, perhaps none is more due appellate deference than conduct of non-judicial participants in the process that is asserted unfairly to have prejudiced the jury. See Arkwright Mutual Insurance Co. v. Philadelphia Electric Co., 427 F.2d 1273, 1277 (3d Cir. 1970); see generally F. James and G. Hazard, Civil Procedure § 7.18 (2d ed., 1977). This is a matter preeminently for on-the-scene sensing by trial judges. At that vantage point demeanor-here that of the jury-can be observed; the impact of efforts to control and dissipate prejudicial effects can be assessed in light of the interpersonal relationship that inevitably develops between trial judge and jury; and the actual effect of the conduct upon jurors-an effect frequently at odds with or actually counter-productive to that improperly intended by the offender-can be gauged first-hand. For the very reason that the problem is essentially one of assessing the immediate emotional and psychological effect of specific actions and words on particular people, the appellate vantage point in retrospective review on a cold written record is especially subject to misperceptions of what actually transpired and, more subtly, to miscalculations of likely effects. It is for this reason that trial court discretion as to these matters is broad or-what comes to the same thing-appellate review is especially deferential.
 
 
 25
 It is important also to emphasize that review here is ultimately focused not upon the impropriety of counsel's conduct but upon the propriety of the trial court's response to it.[9] Of course if the conduct challenged is not by applicable standards improper in the first place, then there can be no abuse of judicial discretion in failing to take any, or particular, action to correct it. But the mere fact that conduct is improper-even grossly improper-does not end the inquiry. The question remains whether the judicial response-or lack of response-to the legally improper conduct constituted a prejudicial abuse of discretion. In consequence, a conclusion that no prejudicial abuse of discretion has been shown is not necessarily a condonation of the challenged conduct, though this is likely always to be-as it is here-the dire assertion of appellants.
 
 
 26
 Orderly review will therefore look first to the question whether and in what respects challenged conduct was in legal contemplation improper, then turn, if need be, to the more difficult question of the adequacy of the judicial response. We proceed on that basis.
 
 
 27
 There is no doubt that tested as and when it occurred by applicable legal standards much of the conduct specifically challenged was improper. Indeed the legal impropriety of some of it has been conceded both below and here by offending counsel. Beyond its legal impropriety, it was in substantial part inelegant, tasteless, offensive, arguably violative of professional standards and, perhaps most deserving of condemnation, irresponsibly threatening to any verdicts that might in the end be obtained by offending counsel's clients.
 
 
 28
 Since in the end we find no abuse of discretion in the trial judge's overall response to it, we might simply let stand this general assessment and disapproval of counsel's conduct. Fair review-to both sides-requires, however, that the general assessment be made more specific. Only so can offending counsel be protected against implication or speculation that things may have been even worse than they were in fact, and appellants be provided an adequately reasoned statement of our basis for decision. Additionally, the adequacy of judicial response can only be fairly gauged in reference to specific conduct.
 
 
 29
 Without attempting full embellishment of some of its more colorful elements, we first identify the specifically challenged conduct. In identifying it in mass and without full contextual detail it is important to keep in mind that of course it did not all occur in such possibly jolting proximity but in pieces over a period of days, and that its real flavor could only be appreciated in full trial context. Here we merely identify it to point up the various respects in which, under applicable standards, it was or was not legally improper to the point that judicial response of some kind was appropriate. For sake of analysis, we group the principally challenged comments and arguments in general categories.
 
 
 30
 In his opening statement to the jury one of the plaintiffs' counsel urged the jury to use the Golden Rule approach in fixing damages. After advising the jury that they would hear evidence of psychic injuries sustained by the plaintiffs and admonishing that "we do not present this evidence to you by way of asking for your sympathy," he added, "(w)hat we do ask you to do is to listen to it carefully, place yourself, if you can, in their shoes."
 
 
 31
 During jury selection government counsel, representing the contribution-claim defendants, called attention to the fact that the defendant air traffic controllers had children, one of whom had recently died. In opening statement the same counsel suggested that the only reason for the contribution claims was to mislead the jury as to the real issues.
 
 
 32
 In closing arguments to the jury different ones of plaintiffs' counsel and government counsel from time to time:
 
 
 33
 -made an outright appeal for sympathy: "I'm asking, I'm begging for your sympathy for this man.... They (plaintiffs) are begging for your sympathy";
 
 
 34
 -made disparaging remarks about defense witnesses: of one witness, that Eastern "must have searched the countryside" for him; and, of his testimony, that "for 40 bucks an hour, you can probably get almost anybody to say anything"; of another witness, Frank Borman, President of Eastern, that he was "pompous," "god-like" and that he, with others in Eastern's management, were now "condoning the very thing that killed 72 people";
 
 
 35
 -made disparaging personal references to defense counsel: "the gang over here"; "the best Eastern's money can buy"; that one was "ashamed" of his case and that plaintiffs' counsel was "sorry for (him) and that kind of attitude";
 
 
 36
 -made improper and intentionally inflammatory comments about Eastern's wealth, position and general culpability: "murderers' row"; the "great white knight corporation"; a "little poor airline" which "offered to buy (another line) for 342 million dollars"; that it had been engaged in "whacking them into the trees in Houston ... running off the runway in Buffalo ..."; had "killed 112 human beings in New York"; that "killing people and maiming people is something they've gotten immune to as a part of doing business";
 
 
 37
 -offered personal opinion as to the injustice and lack of merit of Eastern's defenses and Eastern's and Aetna's contribution claims: "outrageous"; "insulting"; attempt to "pass the buck"; "Eastern's bad joke"; "makes me sick"; makes me "angry"; "haven't really taken on that human responsibility to say we're sorry"; "lack of accountability"; and offered contrasting personal opinions as to the justice and merit of plaintiffs' tactical decisions not to sue the United States and the air traffic controllers: "the reason ... is a simple one, (t)hey aren't liable, and we have a duty ... not to sue people or the government when there isn't any liability";
 
 
 38
 -made improper references to settlements and settlement offers: "no offer to settle Mrs. Weston's case as long as I have been the attorney for the case"; defense counsel represents "the 19 insurance companies that have been busy buying off the claims of the other people, and he's finally run up against three human beings ... and three lawyers that ain't going to be bought."
 
 
 39
 For purposes of this appeal we can accept that most of these statements and arguments (and there were others of comparable quality) were legally improper-in the sense that at the least and as to most some kind of censure or curative instructions by the trial judge-either sua sponte or on motion-would have been appropriate. Some obviously fell more clearly beyond the bounds of permissible advocacy than others. Some arguably lay at least marginally within legal bounds if not within those of the common civility that countless good lawyers have demonstrated is compatible with effective advocacy.
 
 
 40
 The Golden Rule appeal in opening statement and the blatant, direct appeal for sympathy in closing argument were plainly improper, and offending counsel concede this. The tasteless and irrelevant comments and allusions to and about opposing counsel were improper under applicable professional standards and justified censure if for no other reason than to preserve some degree of respect among the attending public for the profession and the process. Less clearly improper in the legal sense-though arguably so close to the line that some cautionary instruction would not have intruded unfairly into the prerogatives of advocacy-were the heavy-handed personal characterizations of witnesses, the equally heavy-handed expressions about the bona fides of the defendants' tactical decisions in defending the actions, and some of the more pejorative comments about the degree of Eastern's culpability in relation to other air crashes. Of the same general stripe were the references to the defendants' refusal to make settlement offers to the plaintiffs, though in fuller context, as will appear, the technical impropriety of those comments may not have been that certain.
 
 
 41
 This leads then to the critical inquiry whether, on total balance, the trial judge's response to these several incidents of clear or arguable misconduct, leading finally to his refusal to set aside the verdicts, constituted a prejudicial abuse of discretion. As to this no more precise legal principles than those implicit in the general concepts of "abuse" and "prejudice" exist. In consequence, there is not much of specific precedential value to be found in other cases-as the parties readily demonstrate on this appeal by their equal ability to cite apparently conflicting decisions on the significance in different contexts of various examples of counsel comments closely comparable to those here in issue. See generally 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 2809 & nn.2-6 (1973). In the final analysis the question is simply one of judgment to be exercised in review with great deference for the superior vantage point of the trial judge and with a close eye to the particular context of the trial under review rather than to any general formulations of principle or to assessments of comparable comments in other cases.
 
 
 42
 Helpful in focusing this general inquiry upon the specific ruling challenged-the refusal to set aside the verdict because of counsel's misconduct-is the Sixth Circuit's recent prescription for practical and principled review of such rulings in City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749 (6th Cir. 1980). Fair review, said that court, must take into account the "totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." Id. at 756.
 
 
 43
 This is a helpful guide to proper and consistent review. It focuses in a practical and systematic way upon whether, all things considered, the virulence of the comments, their intrinsic capacity unfairly to prejudice the jury on the real issues, the inadequacy of any judicial efforts made to contain them or of any extrinsic factors of time or context to dissipate their force, make it a "reasonable probability," id., that they improperly influenced the jury in reaching its verdict. "Improper influence" here must be understood to mean effective subversion of the jury's reason or of its commitment to decide the issues on the evidence received and the law as given it by the trial court. Only if such a reasonable probability is found can an abuse of discretion in declining to set aside that verdict be found. Our review on that basis discloses no such abuse.
 
 
 44
 Perhaps the single most important of the relevant circumstances here is the nature of the "real" issues before the jury. It is only with respect to these that the probability of improper influence can properly be gauged. They determine not only the content range of proper comment and argument but, to a considerable extent, the degree to which improper influence as opposed to the normal influence of partisan advocacy can be reckoned as probabilities in explaining the verdicts.
 
 
 45
 The dominant issue in this trial was the degree of Eastern's conceded culpability. This bore directly upon that defendant's liability for punitive damages. It bore less directly, but nevertheless legitimately, upon the claim of Aetna to recover contribution from the air traffic controllers as alleged joint tortfeasors, since it was inextricably bound up in the primary issue of proximate causation central to that claim. It also of course bore directly upon the amount of punitive damages that might be recovered against Eastern. The other issues in the case were the amounts of compensatory damages due the three plaintiffs, liability for some amounts having been conceded.
 
 
 46
 The permissible range and content of inevitably damaging evidence and argument opened by these issues was wide and of an inescapably volatile nature. On the culpability issue, the substantive law not only permitted but required evidence-hence partisan argument-going to establish negligent conduct that a jury could find gross, wanton, and consciously indifferent to others' rights. See, e.g., Robinson v. Duszynski, 36 N.C.App. 103, 243 S.E.2d 148 (1978). On the compensatory damages issue, the nature of the injuries suffered by the miraculously surviving, completely faultless personal injury plaintiffs-hence of the evidence to establish its severity and lasting effect-was necessarily calculated to excite in any jury some degree of human sympathy, with or without overt appeals for it by counsel. See Herman v. Hess Oil Virgin Islands Corp., 379 F.Supp. 1268, 1275 (D.V.I.1974), aff'd, 524 F.2d 767 (3d Cir. 1975).
 
 
 47
 When such issues legitimately dominate the trial of a case, a trial judge may well have a heightened obligation to police counsel against excesses of zeal and deliberate impropriety. By the same token, the obligation must be recognized as an exceedingly difficult one to discharge in fairness to both sides. In such cases the substantive law itself invites, indeed compels, inquiry into emotion-laden areas, hence evidence and argument that necessarily track the substantive law's content. In consequence, a trial judge attempting to contain excessive emotional appeals by counsel must be concerned as well to avoid unfair intrusions into the prerogatives of advocacy in developing the issues legitimately in dispute. Punitive damage issues-whether gross culpability exists, the amount required to deter and punish-are of course prime examples.[10]
 
 
 48
 Not only does the dominance of such issues justify cautious policing of emotional sallies during trial. More importantly for our purposes, it counsels great caution by reviewing courts in finding improper influence as the probable reason for a verdict disfavoring a party against whom the influence of peculiarly damaging but wholly proper evidence already inevitably runs so strongly.
 
 
 49
 When the specifically challenged arguments here are related to the real issues and to the verdicts returned upon them, perspective is properly gained. Without condoning them, we can lay aside as offensive irrelevancies-sufficiently dissipated in any event by general cautionary instructions of the trial judge[11]-the snide allusions to and characterization of opposing counsel, of that counsel's conduct of the litigation, and of opposing witnesses. The theoretical possibility that either alone or in cumulative effect these may have exerted some generally improper influence on the jury's deliberations cannot be gainsaid. To find this a reasonable probability, however, would denigrate a jury whose obvious care in deliberating on this case over a period of some seventeen hours strongly belies even the possibility that its reason and its will to obey its mandate could have been subverted by such uninspired flights of invective.
 
 
 50
 The pejorative characterizations of Eastern's culpability, wealth, and callousness related essentially to the punitive damage issue. While gross and unimaginative in tone and phrasing, the substance of these arguments and comments lay at least arguably within the range of fair comment on evidence properly introduced on this issue. More importantly, their intended influence-whether proper or improper-was not realized on this issue since the jury found in Eastern's favor on it. That the arguments may indirectly and improperly have influenced the compensatory damage verdicts is a possibility recognized by the district judge that is better assessed in connection with our consideration of the size of the damage verdicts as itself suggestive of improper influence.
 
 
 51
 This leaves the Golden Rule suggestion in opening statement and the direct appeal for sympathy and the settlement comments in closing argument. We look first to the comment that no settlement had been offered.
 
 
 52
 Aside from the possibility that this comment by counsel for plaintiffs may have been invited,[12] we think the trial judge adequately corrected and dissipated any improper influence stemming from it. Immediately after the comment was made, the judge, on objection of opposing counsel, severely admonished offending counsel in the presence of the jury and gave a firm and clear cautionary instruction.[13]
 
 
 53
 The Golden Rule and sympathy appeals are the most obviously improper arguments from a technical standpoint. Having no legal relevance to any of the real issues, they were per se objectionable in this case as they are in any. See, e.g., Leathers v. General Motors Corp., 546 F.2d 1083, 1086 (4th Cir. 1976). Because here they had the potential, and were undoubtedly intended, improperly to influence the jury on the compensatory damage issue, their possible impact on that issue deserved careful attention. The following circumstances suggest that, as the district court concluded, actual prejudice from them was in the event unlikely. In the first place, no contemporaneous objection to either was made by trial counsel.[14] While silence may sometimes reflect a prudent tactical assessment that objection will only magnify prejudice so that failure to object should not be held against the nonobjector, see Werner v. Upjohn Co., 628 F.2d 848, 854 (4th Cir. 1980); Leathers v. General Motors Corp., 546 F.2d at 1086, it may also reflect a deliberate sandbagging tactic, see Skogen v. Dow Chemical Co., 375 F.2d 692, 703 (8th Cir. 1967), or a tactically sound assessment by the person best able to judge the matter that though technically objectionable, the comment threatens no significant prejudice. Without speculating about possible sandbagging tactics, of which there is no intimation in the record, we are satisfied that the last possibility is the most realistic one here.[15]
 
 
 54
 The Golden Rule appeal was made in an opening statement several weeks before the case was submitted to the jury. It was, in fact, a rather cryptic interstitial comment which in context may well not even have conveyed to the jury the impermissible suggestion implied by the term. The issue of compensatory damages on which it bore was not a thin one that might actually have been tipped by the suggestion: liability was conceded, substantial damages in some amount were inevitable given the severity of the injuries concededly suffered. Cf. Leathers v. General Motors Corp., 546 F.2d at 1086 (reversible error where liability issue "thin").
 
 
 55
 The outright appeal for sympathy occurred some three weeks later in closing argument by another counsel for plaintiffs. It was the only such appeal made in an argument lasting some forty minutes that was not otherwise objectionable. No comparable direct appeal for sympathy was made in either of the two other closing arguments by plaintiffs' counsel. This was not a drumfire effort. See Moore v. Telfon Communications Corp., 589 F.2d 959, 966 (9th Cir. 1978). It was made in behalf of a terribly injured plaintiff whose condition as properly presented to the jury was so naturally provocative of sympathy that the lawyer's overt appeal is best seen in context as a foolish redundancy rather than an independent source of prejudice.
 
 
 56
 We turn now to the verdicts themselves as circumstances indicative of improper influence. Eastern's contention on this point is inextricably bound up with its related contention that the damage awards should have been set aside as per se excessive. While possibly susceptible to separate conceptual analysis, these contentions are so closely related that we treat them here together.
 
 
 57
 The personal injury damage awards were indeed substantial: $3,027,500 for Arnold's personal injuries; $1,137,500 for Mihalek's. The district judge carefully considered the contention that they were so substantial as to be excessive and manifestly the products of passion or prejudice, whether traceable specifically to counsel's misconduct or to unidentified causes. It lay within his sound discretion to set the verdicts aside if he conceived them to be excessive without regard to a specific reason, or if he thought them indicative, either alone or in combination with other circumstances, that counsel's misconduct had probably inflated them to the point of excess. It also lay within his sound discretion to determine that all things considered they were not excessive, hence to decline to set them aside. This of course he did. Our review of that determination-without regard to the alleged cause of excessiveness-is only to assess whether on an independent review of the evidence, see Grunenthal v. Long Island Rail Road, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); West v. Richmond, Fredericksburg & Potomac Railroad, 528 F.2d 290, 292-93 (4th Cir. 1975), the awards were so "untoward, inordinate, unreasonable or outrageous," Grunenthal, 393 U.S. at 160, 89 S.Ct. at 334, that we must set them aside in exercise of our review power. As Judge Sobeloff pointed out in defining our role in reviewing such rulings, we are confined to looking for something more than mere "excessiveness":
 
 
 58
 We operate in a narrower area of discretion than district courts in the supervision of jury verdicts. It is not enough if our appraisal of a jury's calculation of damages does not run parallel to the trial judge's appraisal. In reviewing the justness of a verdict the broader scope of discretion is in the trial judge, and the Supreme Court has made it plain that the appellate court must stand aside. The Court has acknowledged the possibility of appellate intervention only in the most extreme circumstances, as where the verdict is not merely excessive but "monstrous," a term borrowed from the old English case, Beardmore v. Carrington, 2 Wilson 244 (1764). In very few cases, however, where such a possibility was discussed has this high hurdle been surmounted.
 
 
 59
 Simmons v. Avisco, Local 713, Textile Workers Union, 350 F.2d 1012, 1020 (4th Cir. 1965) (footnote omitted). Or, as Judge Medina put it for the Second Circuit:
 
 
 60
 If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem counsels restraint. Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand.
 
 
 61
 Dagnello v. Long Island Rail Road, 289 F.2d 797, 806 (2d Cir. 1961) (footnote omitted), quoted with approval, Grunenthal v. Long Island Rail Road, 393 U.S. at 159, 89 S.Ct. at 333.
 
 
 62
 In conducting this extremely limited review to determine whether a verdict is not merely excessive but outrageously or monstrously so, we have recognized that a verdict cannot be so characterized if there is in the record credible evidence which if accepted by the jury and given its most favorable inferences will support it. See West v. Richmond, Fredericksburg & Potomac Railroad, 528 F.2d at 292. Reviewing on this basis and under this standard we cannot hold these verdicts outrageous or monstrous in relation to the evidence of record.
 
 
 63
 In each of the personal injury cases, the major component in the damage award was pain and suffering, an item obviously not susceptible to fixing with mathematical precision but instead a matter of collective juror judgment based upon the relevant evidence and the commonly shared human experience. It is as to this component that the inquiry into excessiveness most directly relates.
 
 
 64
 Looking first to the Mihalek award of $1,137,500, a total of $7,934 in medical expenses was established without dispute. Though Eastern sought by careful cross-examination to discount the actual extent of Mihalek's pain and suffering and loss of past and future earnings, it offered no evidence directly refuting plaintiff's evidence. That evidence would have justified the jury in accepting the following view of the consequences of the accident as now contended in Mihalek's behalf.
 
 
 65
 On September 11, 1974, Mihalek, then a forty-five year old businessman, was a passenger in the first-class section of Flight 212. In the crash he was critically burned, lacerated and battered. His hands were so burned that the flesh was hanging by the knuckles. Burns extended over the entire top of his head, and portions of his forehead, cheek, ear and neck. There were burns on his back, his right forearm and his elbow. The arm was broken, with the bone protruding at the elbow. Mihalek was hospitalized for five weeks. After he was released, he was required to make continuing periodic visits as an outpatient for physical therapy well into 1975. He has a permanent limitation of approximately 22% in the functions of his various limbs and digits.
 
 
 66
 The most devastating injuries to Mihalek as a result of the crash of 212, however, are emotional ones. Before the accident, he was a good father and family man, an industrious and aggressive businessman who liked to tackle and solve problems, an outgoing, energetic individual who was considered by business associates to be extremely efficient and honest. Before the accident, he had worked his way up at AVCO-Lycoming from a machinist into the position of Director of Industrial Engineering. When that organization closed the facility at which he was employed, Mihalek began his own company. So successful was this venture that another company subsequently bought Mihalek out and transferred him to Charleston, where he was to supervise 40 people in the start-up of a new facility. Mihalek's energy, business acumen and supervisory ability during these years resulted in his annual income rising from $20,944 in 1970 to $143,988 the year preceding the crash.
 
 
 67
 After the accident, Mihalek suffered devastating emotional difficulties. He was unable to cope with seemingly minor situations, became very docile and tended to stay at home. He would burst into tears spontaneously at home, in public, and with friends. He felt detached, withdrawn, and unmotivated; suffered from loss of interest and loss of energy; and had difficulty in completing simple tasks. The most devastating effect on this once-vital man was that he had lost a sense of power and control over his own life. He had problems concentrating and he had a sense of unease, dread and anxiety. His income dropped severely and during the four years preceding the trial, he had no income at all.
 
 
 68
 According to an expert psychiatric witness who examined Mihalek, he suffered from a chronic post-traumatic stress disorder precipitated by the accident and is permanently psychologically impaired because of the accident. According to an expert economics witness, the present cash value of the actual economic loss to Mihalek because of the crash of 212 is $520,689 exclusive of such job-related benefits as life insurance, health insurance and a retirement pension plan.
 
 
 69
 Commenting on this evidence, the trial judge cogently observed that from it "the jury was entitled to conclude ... that ... Mihalek ... has suffered a lifetime psychic disability, and that as a result ... a once confident, ambitious, and highly competent business executive has been reduced to passivity, inactivity and despair ....; starting from that premise, there is nothing excessive or shocking in the award of $1.1 million that, in addition to the other demonstrated elements of damage, compensates Mr. Mihalek for the lifetime loss of what he was as a person before the accident occurred." We would not be disposed to quarrel with that assessment were our standard the same as the trial judge's. Certainly, gauging it by the narrower standard of "outrageousness," we would not.
 
 
 70
 Turning to the Arnold award of $3,027,500, the undisputed evidence established medical expenses of $50,646 and lost wages of $13,386 as of trial time. As with the Mihalek evidence, Eastern sought to discount Arnold's evidence of pain and suffering and loss of future earnings only by cross-examination. From Arnold's evidence, the jury could have accepted the following view of the consequences of the crash to him in relation to these items of damage. At the time of the crash, Arnold, a passenger, was a thirty-one year old systems engineer employed by IBM. He was a college graduate who before joining IBM had been honorably discharged as a captain in the United States Air Force where he programmed computers. In the crash he suffered multiple lacerations and general trauma, but his principal injury was by burning. He was severely burned over extensive portions of his body. Taken after emergency treatment in Charlotte to the Medical College of South Carolina in Charleston, he was hospitalized there in the Burn Unit of the hospital for two and a half months where he received extensive treatment of a painful and emotionally destructive nature.
 
 
 71
 A total of 33 debridements (the cutting away of dead skin in order to get to live skin) were performed. He underwent eight skin graft operations, many of which required that he be put upon a Stryker frame which suspended him upside down for days. After Mr. Arnold left the hospital, he continued outpatient therapy. He had to learn to walk again and suffered severe physical deformities. Additionally, after his initial stay in the hospital, Arnold underwent four operations in an attempt to restructure his hand.
 
 
 72
 The major permanent injuries sustained were to his hands. According to an orthopedic and hand surgery specialist, Arnold's right hand was 100% permanently disabled and his left hand has a 52% total permanent disability. The remainder of Arnold's body was horribly scarred from the burns and the frequent skin grafting attempts. The jury viewed the skin on Arnold's body, still terribly deformed after five years. According to an expert psychiatric witness, Arnold suffers from a chronic neurotic illness which he would continue to have unless he went into intensive psychotherapy, and in consequence looks upon himself as a defective individual.
 
 
 73
 In commenting upon Arnold's evidence of pain and suffering, the trial judge remarked that "though dramatic" it was "credible and without parallel in the experience of the trial judge" and stated that "in combination with the lifetime disfigurement and disability proved at trial and other proved damages, (it) renders the $3 million award neither excessive nor shocking."
 
 
 74
 Reading the cold record, we might be more adversely affected by the apparently contrived dramatization of some of Arnold's testimony than was the trial judge in whom it only prompted a passing characterization. But this simply illustrates the reason why our discretion in review is wisely made narrower than his in assessing the probative force of this kind of evidence. We are not prepared to say that the size of this verdict does more than make the question of excessiveness with us a close one. As indicated, that is not enough to justify substituting our judgment for that of the trial judge. He had the supreme advantage of assessing not only Arnold's demeanor as a witness and his personal appearance but also of gauging the immediate reaction of the jury to his patent over-dramatization of events and conditions and his rather obvious efforts at ingratiation.
 
 
 75
 When all is discounted, there remains the fact that Arnold has sustained at age thirty-one injuries which, in addition to the immediate consequences of profound physical and emotional shock, intense post-crash suffering, and painful and demeaning medical treatment, have left him, after the best endeavors of medical science, a relatively young man permanently disabled in essential body functions, permanently scarred and disfigured in physical appearance, and permanently damaged emotionally and psychologically. Though he remains a functioning human being, he has been substantially shattered as the whole person he was before the crash, and will live out his days suffering the consequences. An award of $3 million to compensate him for these consequences in addition to his direct monetary losses and expenses is undoubtedly a generous one and one which might in the exercise of sound trial court discretion have been deemed excessive, but we cannot say of it that it is so monstrous or outrageous that we should intervene in the jury's fact-finding function to disturb it at the appellate level. See generally 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2820 & nn.95, 97 (1973).
 
 
 76
 In sum, upon considering the totality of the circumstances bearing upon the matter, we cannot say that it is reasonably probable that counsel's misconduct-objectionable as it was in many details-improperly inflated these damage awards. There are too many other and proper bases upon which their concededly generous amounts may be explained.[16] To indulge such an assumption would be to denigrate a jury which to all appearances of record was not in a "runaway" mood in which it would be likely prey to such influences. It would also be to assume that the various cautionary instructions of the trial judge, only some of which we have specifically noted,[17] were disregarded by the jury. We think that instead we must presume on this record both that the jury understood and was faithful to its general mandate and that it was responsive to the specific cautionary instructions. Neither are we prepared to say upon an independent review of the evidence, see Grunenthal v. Long Island Rail Road, 393 U.S. at 159-60, 89 S.Ct. at 333, that the amounts of these awards are so outrageous, or untoward, or monstrous that, irrespective of cause, they must be set aside in exercise of our narrowly constrained appellate review powers. See Neese v. Southern Railway, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955).
 
 
 77
 For many of the same reasons, we much more readily conclude that counsel's misconduct cannot be declared a "reasonably probable" explanation of the jury's verdict against Aetna on its contribution claim. Laying aside all the other factors, the critical circumstance here is that, to us, the issue of concurring negligence-of proximate causation-on which this claim turned, simply cannot be assessed as one so "close" that we would be justified in attributing the verdict upon it to any such improper influence. While the issue going in was obviously an honestly disputable one, the evidence adduced readily explains the jury's determination that if there was any negligence on the part of the air traffic controllers it was, in the district court's stated analysis, a "remote rather than a proximate cause."[18] We are not prepared to reject that ready and proper explanation in favor of the improper one for which Aetna contends. Obviously we find no abuse of discretion in the district court's refusal to set aside this verdict on this ground.
 
 III
 
 78
 Eastern and Aetna have either jointly or independently assigned other errors which we have considered, found not to require reversal, and merely identify here without extended discussion.
 
 
 79
 Eastern complains of the admission of evidence concerning crashes that occurred after the one here in issue. We agree with appellees that in the peculiar context of this trial and particularly in view of Eastern's attempt in earlier testimony to establish an improving safety record at the critical time, the district court did not abuse its discretion in admitting this evidence as relevant, both for direct and rebutting purposes, to essential elements of the punitive damages claim. On Eastern's and Aetna's challenge to the district court's findings and conclusions exonerating the United States from liability for contribution, we find no clear errors of factual finding nor errors of law justifying reversal. Indeed we find the findings and conclusions unassailable on the evidence adduced. Aetna has complained of the court's instructions to the jury on the contribution issue, but after a review of those instructions in total compass we find no prejudicial error. We think that the instructions properly explained the relevant principles of concurring negligence and proximate causation that controlled resolution of the contribution issue. Finally, we see no error in the district court's refusal to admit Aetna's proffer of certain evidence related to improper training and supervision of the air traffic controllers. Other evidence on the issue was admitted, and the district court's exercise of its discretion in refusing the additional proffers was not improper.
 
 IV
 
 80
 On Eastern's challenge to the district court's action in allowing the Weston wrongful death plaintiff to accept a remittitur of $50,000 and entering judgment on the reduced verdict we find error which, regrettably, requires reversal and remand.
 
 
 81
 Before the jury retired, counsel for Eastern duly objected to the submission to the jury of pain and suffering as a compensable item of damages on the wrongful death claim. The basis of this objection was that there was insufficient evidence that Weston had survived the crash even momentarily to permit an inference that he consciously experienced any pain. The district judge permitted the jury to consider the question, but in his written ruling upon Eastern's post-verdict motions to set aside the verdict, he stated that upon reflection he was persuaded that he had committed "technical error" in submitting this as a recoverable item of damages. On that basis he ordered a new trial on damages alone conditioned upon plaintiff's refusal to accept a remittitur of $50,000. When plaintiff accepted the remittitur in this amount, the court entered judgment in the reduced amount of $797,000. We express no opinion as to whether this issue properly should have been presented to the jury, but we nevertheless hold that the use of the remittitur device here was improper.
 
 
 82
 Having accepted the remittitur, the plaintiff did not, as she could not, Donovan v. Penn Shipping Co., 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), appeal from the resulting judgment. In consequence, on Eastern's appeal the only issue presented for review is the propriety of the district court's action in allowing the remittitur as a means of correcting its perceived error. The precedent ruling, that trial court error made the verdict unsupportable in the amount awarded, is not properly before us for review. Only the plaintiff, as the party aggrieved by it, could challenge it on appeal. Though as appellee she has sought to do so, contending that pain and suffering was properly submitted, she is limited as appellee to defending, on any grounds available on the record, the judgment as entered and may not seek to enlarge her rights under it, as would a successful attack upon the ruling. United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924).[19] Our review is therefore limited to the issue raised by Eastern's appeal on this point: whether the corrective action thereafter taken by the trial court was proper. We hold that it was not.
 
 
 83
 Remittitur may properly be used to remedy an excessive award of damages made by a properly instructed jury if the award is not attributable to passion or prejudice. See generally 6A Moore's Federal Practice P 59.05(3). But we agree with those courts that have held that it may not properly be used over a defendant's objection to remedy a trial judge's error unless the amount of the award traceable to that error can be at least closely approximated or capped by a maximum figure through resort to the trial record. See Durant v. Surety Homes Corp., 582 F.2d 1081, 1085-86 (7th Cir. 1978); Jacoby v. Johnson, 120 F. 487, 488-89 (3d Cir. 1903); see also New York, C. & St. L. R. Co. v. Niebel, 214 F. 952, 957-58 (6th Cir. 1914) (appellate court similarly limited). Where, as in this case, a jury's undifferentiated lump sum damage award[20] is made up of a number of properly compensable items and one noncompensable item, use of remittitur involves judicial correction of a jury's verdict by a process of determining "an unknown fraction of an unknown portion of an unknown whole," Niebel, 214 F. at 958. This goes beyond the traditional bounds of the device for correcting jury excess and impermissibly impinges upon the right of the defendant "to have the damages assessed by a jury under proper instructions by the court." Jacoby v. Johnson, 120 F. at 488. To correct this error there was, in unfortunate consequence, but one recourse for the trial court and even more unfortunately there is now for us but the same recourse[21]-to require a new trial on the damage issue as the defendant's due. Id.[22]
 
 V
 
 84
 The judgment is affirmed in all respects save that respecting the Weston wrongful death claim. As to that claim the judgment is reversed and remanded for further proceedings consistent with this opinion.
 
 
 85
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 86
 MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 87
 The overburden on our federal judicial system is no little matter. Judge McMillan faced an aggravated strain on the orderly functioning of his court as an aftermath of a tragic airplane crash. Eastern Airlines flight 212 on September 11, 1974 plummeted to earth near Charlotte, North Carolina, killing 69 passengers and 2 crew members. Nine passengers and 2 crew members survived.
 
 
 88
 The following lawsuits piled up in the United States District Court for the Western District of North Carolina, threatening a massive legal traffic jam:
 
 
 89
 1. The action of Richard Arnold IV for personal injuries;
 
 
 90
 2. The action of Francis C. Mihalek for personal injuries;
 
 
 91
 3. The action of Helen Rae Weston, as executrix, for the wrongful death of her husband, Lewis D. Weston;
 
 
 92
 4. The action by The Aetna Casualty Company and other insurers of Eastern Airlines under the Federal Tort Claims Act, 28 U.S.C. § 2674, against the United States, and under North Carolina common law against four air traffic controllers, claiming negligence which assertedly caused the crash.
 
 
 93
 The claims of the insurers sought indemnification or contribution for settlements made with more than 70 other victims of the crash or their next of kin.
 
 
 94
 In the Arnold and Mihalek cases, Eastern Airlines impleaded the United States, claiming that the air traffic controllers had negligently contributed to the accident. Eastern acknowledged its own liability for compensatory damages in all three accident cases but denied liability for punitive damages and put the three plaintiffs to their proof as to the amounts of compensatory damages.
 
 
 95
 Obviously, if each of the actions were separately tried, it would take months to dispose of all the litigation generated by a single incident. Some cooperation designed to relieve the situation took place. The parties did not contest the consolidation for trial of the Arnold, Mihalek and Weston cases.
 
 
 96
 Judge McMillan decided, however, that things must go further in that direction. He, sua sponte, but over the objection of Eastern Airlines and of the insurance companies, ordered all the cases consolidated.
 
 
 97
 To try all the cases together admittedly presented problems of some substance. First the consolidation of the three accident cases with the claims of Aetna and the other Eastern insurers seeking indemnification or contribution necessarily meant a disclosure to the jury that Eastern Airlines was insured, and that insurance carriers, rather than Eastern Airlines itself, would bear all or a substantial portion of any award to Arnold, Mihalek or Weston. It is, of course, well established that such information should, to the greatest extent possible, be concealed from the jury. E.g., City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749 (6th Cir. 1980); Langley v. Turner's Express, Inc., 375 F.2d 296 (4th Cir. 1967); Fincher v. Rhyne, 266 N.C. 64, 145 S.E.2d 316 (1965). See Fed.R.Evid. 411. ("Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully.").
 
 
 98
 Second, the insurance companies, to quantify their claims, would have to bring out just what they had paid in settlement to crash victims or their next of kin. Those awards totaled almost $22 million-an average recovery of over $314,000-and could well influence the jury to apply some kind of victim fungibility rule ("If the loss of Jones injured his family to the extent of $314,000 certainly Smith's-or Weston's-family should be treated no less handsomely"). Of course, the peculiar and varying facts of each case should be determinative, with no attention paid to what some other unfortunate victim got.
 
 
 99
 I am ready to assume, for the purposes of this case that, despite difficulties which customarily would dictate separate trials, consolidation of all the cases was, nevertheless at least theoretically proper, in view of the great dislocations that otherwise were in store for the Western District of North Carolina. Fed.R.Civ.P. 42(a). But, by the same token, the very elimination of customary safeguards, regarded as necessary to insure fairness in the courts, imposed a heightened need to insist on scrupulous fairness in all other aspects of the trial of the consolidated cases. Otherwise the Fed.R.Civ.P. 42(b) mandate to the district court that it conduct, if necessary, separate trials to avoid prejudice would be consigned to the dead letter heap.
 
 
 100
 Eastern Airlines was the one from whom customary safeguards, for reasons of overriding exigencies, were withdrawn. It did not, as the cases proceeded through trial, receive scrupulously fair treatment. Quite to the contrary, it was subjected to abusive and overreaching behavior recognized by Judge McMillan himself as excessive-beyond the normal leeway allowed counsel under the excitement and tension of a hotly contested trial.[1]
 
 
 101
 If such abuses had taken place where each of the Arnold, Mihalek and Weston cases was separately tried, or where, while those three cases were consolidated the remaining cases were not,[2] the existence of insurance and the knowledge of recoveries by other victims would not have been thrown into the jury's pot. Probably then corrective action by the district judge with respect to abuses by counsel would have sufficed to insure the doing of justice. Whether instructions to disregard and scoldings of counsel are sufficient to counter the prejudice of improprieties by counsel is a matter which customarily falls within the scope of the trial judge's discretion.
 
 
 102
 But here all the flexibility for accommodating to and neutralizing such prejudice had been exhausted at the outset by the imposition on Eastern Airlines of the not insubstantial weight of disclosure of insurance and of the amounts paid to others. Indeed, the counsel committing the improprieties even seized on the opportunities to enmesh, and thereby enlarge, the two areas of probable prejudice. Among the blatantly improper brayings were the following statements by counsel representing all three plaintiffs:
 
 
 103
 Finally, Richard Arnold. Evidence of the injury are again met with insults. The mind is a wonderful thing, suggests John Golding. After a while, you forget the pain. Isn't that marvelous? Isn't that a wonderful thing to come before you and say? If that were true, why should we compensate anybody under any conditions for the pain which they suffer? Let's just wait a while. Let's engage in a long lawsuit and drag our feet for five years and, by then, I guess we're pretty well assured he would have forgotten all of the pain, every bit of it; and, as to the innuendoes about the motivation of the plaintiffs in this lawsuit and his reference, which I believe to be improper, to other lawsuits which were settled, some of which were settled-I might add-while the jury was out, let me say this to you. There has been no offer to settle Mrs. Weston's case, as long as I have been the attorney for the case.
 
 
 104
 On objection by Eastern Airlines, the district judge admonished counsel to "stay off subjects which are forbidden for counsel to argue to juries whether they are true or false," and instructed the jury that offers of settlement were irrelevant to the issues before it. He concluded with the statement:
 
 
 105
 You better obey. The next time there won't be just a reprimand. This is not an idle suggestion Mr. Smiley. ... Counsel are forbidden to discuss that subject any more in this case.
 
 
 106
 Yet subsequently, during closing argument, Mr. Diehl, attorney for one of the plaintiffs, stated:
 
 
 107
 He (Mr. Golding) represents with Mr. Rutherford (attorney for Aetna) the 19 insurance companies that have been busy buying off the claims of the other people and he's finally run up against three human beings sitting right there and three lawyers that ain't going to be bought.
 
 
 108
 Later, in a discussion between the court and counsel, out of the presence of the jury, about how to remedy the situation occasioned by those remarks, the court observed:
 
 
 109
 COURT: I should have smacked him about 500 bucks before he was allowed to argue another word to the jury, but I thought this was the quickest and simplest.
 
 
 110
 In sum, it seems that Judge McMillan was carried away with enthusiasm for the seeming reasonableness and efficiency of his consolidation plan. He was so committed to it that he could not bring himself to abandon it, even when outrageous excesses by counsel for the individual plaintiffs turned trial to travesty.
 
 
 111
 What appears to have happened is that counsel for the three plaintiffs and for the government, learning the district judge's final determination that there was to be one trial and one trial only,[3] knew that they could safely practice gross abuses, in the certain knowledge that they ran no risk that the district court would employ that extreme, but ultimately efficacious, sanction, namely declaration of a mistrial. While whether to grant a mistrial lies within the trial judge's discretion, it constitutes abuse of discretion to reveal, in advance, that practically no conceivable circumstances would lead him to invoke the remedy of mistrial. To do so predictably will cause the trial judge to lose control of the situation. That, I submit, is inescapably what happened here. To reread the egregiously unprofessional utterances (see my footnote 1 and the text of my dissent at 210-211) establishes, beyond peradventure, that such was the case.
 
 
 112
 In sum, the case was one where prejudicial comments by counsel, in the totality of the circumstances, necessitated reversal and a new trial. City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 758-59 (6th Cir. 1980).[4]
 
 
 113
 In the majority's opinion we observe an open invitation to outrageous misbehavior by trial lawyers. Each plaintiff's lawyer may, from now on, be expected to ask: "What is a mere slap on the wrist, if, in exchange, I enhance my client's recovery by hundreds of thousands of dollars? Others will come to me for representation on the basis of the size of the recovery, not on whether I behaved decently in court." As politicians know, in like circumstances, the apt response is: "I don't care what you say about me, as long as you spell my name correctly."
 
 
 114
 Counsel now are insulated from any adverse consequences of utterly unprofessional conduct so long as they are careful to keep the invectives in the gutter. The majority places its imprimatur, its nihil obstat, upon "uninspired flights of invective." At 199. The maintenance of proper courtroom standards has suffered a grievous blow from this day's work. I pray for its recovery.
 
 
 115
 In light of all of the abuse heaped on Eastern Airlines, my conscience is shocked that it should be compelled to pay damage awards extracted from the jury through resort to such offensive tactics. Thus I would reverse, in the Arnold, Mihalek, and Weston actions, for a new trial limited to fixing the proper amounts of compensatory damages. Since the jury, even despite the prejudicial atmosphere of the trial, to Eastern Airline's detriment, determined that no punitive awards would be proper, that portion of the judgment should not be disturbed. The improper, incurable prejudice all flowed in one direction.
 
 
 116
 Furthermore, as to the claims against the United States and the air traffic controllers, I perceive no sufficient prejudice respecting those quite different causes of action to necessitate a new trial. The claims against the United States had to be tried non-jury, and the air traffic controllers were fully relieved of liability by reason of the judgments entered on the claims against the United States, irrespective of how they came out, 28 U.S.C. § 2676. Judge McMillan was not exposed to the likelihood of prejudice in the way that the jurors may be expected to have been.
 
 
 117
 I concur with Judge Phillips in his conclusion that, for the reasons he has advanced, the Weston case must be remanded for retrial of the compensatory damages issue.
 
 
 118
 It is a source of regret to me that similar remands are not ordered in the Arnold and Mihalek cases. With hindsight we can clearly see that the consolidated cases should have been separated into two groups for purposes of trial. As they stand we are to end up having two trials anyway. Arnold and Mihalek should, with the Weston executrix, relitigate the amounts of compensatory damages they are entitled to and thereby receive fair and impartial judgments, not the ones flawed by prejudice which, by the majority's decision, they will retain.
 
 
 
 [1]
 The fault specifically admitted by Eastern as the basis for its liability was the "failure of the pilots to be aware of the plane's altitude immediately prior to the crash." On trial the exact nature of this fault was amplified by specific evidence-mainly that preserved by on-board and airport recorders-of pilot inattention and carelessness which the trial judge characterized, with full support from the record, variously as "a shocking lack of attentiveness," "unattentiveness and carelessness of a truly extraordinary nature," "not simply inadvertent but grossly negligent."
 
 
 [2]
 The claim as originally pleaded included full indemnification as an alternative on the basis of primary negligence of the air traffic controllers. This alternative was abandoned before trial
 
 
 [3]
 Along with two other actions by airline stewardesses against the United States that were settled before trial
 
 
 [4]
 The trial format established by the court before trial provided for trial of all the claims to the jury whose verdicts however were only to be advisory with respect to Eastern's third-party and Aetna's direct contribution claims against the United States. As to those non-jury claims, judgment would be entered upon the court's findings and conclusions. Though trial proceeded on this assumed basis down to submission, the court declined at that point to submit the claims against the United States to the jury for an advisory verdict. See Part III, infra
 
 
 [5]
 Though these assignments run to the Weston wrongful death judgment as well as to the two personal injury judgments, we discuss them here only in relation to the latter in view of our remand of the wrongful death action on other grounds. See Part IV, infra
 
 
 [6]
 Coupled with contentions of counsel misconduct is one of misconduct by plaintiffs' witness Crossfield, a former Eastern vice-president. We have considered that contention and finding it without merit do not further discuss it here
 
 
 [7]
 The court gave careful cautionary instructions to the jury in advance of the presentation of evidence designed to clarify the relationships between the different parties and the different claims and to emphasize the necessity that matters relevant to one claim but not to another be kept in mind. The instruction was exemplary in its clarity and accuracy
 
 
 [8]
 In the event, the commonality of these issues was made plain by trial developments. Indicative is the trial judge's assessment of the evidence as it bore upon the contribution claims directly against the United States which he decided nonjury. The same evidence of course bore upon the asserted individual liability of the air traffic controllers as alleged joint tortfeasors with Eastern, an issue submitted to and decided by the jury
 After recognizing that "pilots and air traffic controllers both have a duty to exercise due care to avoid accidents ..." and that "(t)he fact that the pilots ... were guilty of negligence, proximately causing an accident, (does not) preclude a finding that negligence on the part of the controllers was also a proximate cause," the judge concluded that on the evidence adduced air traffic controller negligence had not been established as a concurring proximate cause. "An accident of this sort could only occur through pilot inattentiveness and carelessness of a truly extraordinary nature. Failure of (the) controllers to observe the altitude of the plane ..., if a cause at all, was a remote rather than a proximate or provoking cause."
 "Moreover, the court is not persuaded, as apparently neither was the jury, that a warning from the tower, if it had been received, would have prevented the accident. The crew were not simply inadvertent but rather were grossly negligent. They distracted themselves with extraneous matters; they did not look out the window to see what numerous others saw-that they were dangerously low; they failed to comply fully with procedures instituted to keep flight crews awake and conscious of their altitude while descending and landing; they ignored the visual readings of five pairs of altimeters and beacons showing that they were too low and descending too fast, and they also ignored a shrill whistle and red light which called their low altitude emphatically to their attention. I am unable to find that an additional request from an air traffic controller that the pilot check his altitude would have changed the outcome."
 
 
 [9]
 The specific response under review is of course the ultimate one: the directly challenged refusal to set aside the verdict. Earlier, pre-verdict responses (or nonresponses) are reviewed incidentally, as elements in the totality of the circumstances bearing upon the exercise of discretion in letting the verdict stand. See F. James & G. Hazard, supra
 
 
 [10]
 In this they share to some extent with libel cases the characteristic that caused Judge Spears to opine in Curtis Publishing Co. v. Butts, 351 F.2d 702, 714 (5th Cir. 1965), aff'd, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that "the very nature of the case made it virtually impossible to discuss the evidence free of emotion or drama," and Judge Wyzanski, writing more generally, to say of a political libel suit that "it is the modern substitute for ordeal by battle" in which "the prudent and second-thinking judge will stand severely aside, acting merely as a referee applying the Marquis of Queensbury rules." Wyzanski, A Trial Judge's Freedom and Responsibility, 65 Harv.L.Rev. 1281, 1283-84 (1953)
 
 
 [11]
 E.g., in closing instructions: "Your verdict is not to be based upon prejudice or sympathy or any bias you may have for or against flyers or people who get hurt. It's not to be based on emotion or on any outside information you may have about the case.... You are not to decide any fact on speculation or guesswork or conjecture. You're not to decide on any basis of a guess as to what you think the Court would do if the Court were the jury.... You are the jury, and you're to pay no more attention to what you think the Court would like for you to do than you are to what lawyer I last cussed out or who I fussed at the longest. The controversy is not between the lawyers and not between lawyer and lawyer, although they are the ones who generate the evidence and the biggest commotion. The question is one of law and justice among the litigants."
 During trial: "(W)hen lawyers have been sitting for hours under tension they sometimes explode, so do judges, and I again instruct you that you are not to decide the case based on anything that takes place among the lawyers or between the Court and lawyers.... A little bit of temper flaring is natural, sometimes a little distraction takes place, but it usually livens up the proceedings, so long as there is not too much of it."
 Whether these cautionary references to the lawyers' behavior and the court's response to it actually had the intended effect is of course beyond any reviewing court's power to gauge. What can be said is that in content it was directly on the mark, and that in the very homeliness of its style it was calculated to put the matter in proper perspective as peripheral flares of temper, "commotion," and "fussing" irrelevant to the jury's fact-finding obligation.
 
 
 [12]
 In his opening statements to the jury, counsel for Aetna, over plaintiffs' objection, told the jury that the insurers had "settled some 70-odd cases and paid out $21,788,957.72." The trial judge speculated in determining how to handle the later challenged comment by plaintiffs' counsel that the first reference may have been an improper attempt to establish in the jury's mind a comparable range of recovery, and that the later comment was an ill-advised, tactically unsound effort to counter that. See Hall v. Texas & New Orleans Ry., 307 F.2d 875, 879 (5th Cir. 1962) (retaliatory argument judged differently)
 
 
 [13]
 To counsel: "You may stay off of subjects which are forbidden for counsel to argue to juries whether they are true or false.... You better obey. The next time there won't be just a reprimand."
 To the jury: "(s)ettlement of a suit or a claim is not admission of anything unless it contains ... a formal admission of facts or formal admission of liability. The fact that a party does or does not offer to settle a case is not something for you to consider, has no bearing on the legal and factual questions which you may have to decide."
 
 
 [14]
 Under the circumstances we are not disposed to seize upon this as a basis for declining review of the specific objections now raised. See New York Central R.R. v. Johnson, 279 U.S. 310, 318-19, 49 S.Ct. 300, 303-04, 73 L.Ed. 706 (1928). Whether the failure to object may then, however, be taken into account in considering the objection on the merits is a different matter
 
 
 [15]
 Eastern's trial counsel-not the same as appellate counsel-were not generally asleep at the switch nor following a general policy of not objecting in order to avoid magnification of prejudice. On at least three occasions they did not object to other arguments and comments by plaintiffs' counsel. None of these, however, is specifically brought forward by Eastern's appellate counsel as examples of improper conduct. To the extent this represents disagreement between trial and appellate counsel as to the potential for prejudice in particular conduct, the former's assessment may well be assumed to be the better informed
 
 
 [16]
 In this connection it is appropriate to note another improper basis which, if accepted, would have provided an independent discretionary ground for setting aside the verdict. This is the possibility that the verdicts represented an improper jury "compromise" of the punitive liability and compensatory damage issues. The trial judge in fact recognized this as a possibility, but in the end of course did not seize upon it as an alternative independent ground for setting the verdicts aside. On this appeal counsel for appellants belatedly seek by this "compromise" theory to trace the prejudice from counsel's misconduct away from the punitive damage issue-on which they won-into the compensatory damage awards. In this they meet themselves coming back. In the trial court they contended-opposing the possibility of a new trial on both issues and arguing instead for new trial on the compensatory damage issue alone-that the jury had not so entwined the issues in its verdict that it was wholly tainted. While the well established procedural bar to such changes of position is not an absolute one and should yield in appropriate circumstances, we see no reason to depart from it here. There was no adversary presentation of this possibility in the district court
 
 
 [17]
 See notes, 7, 11, 13 supra
 
 
 [18]
 Made in deciding the contribution claim against the United States non-jury. See note 8 supra
 
 
 [19]
 We note that in Durant v. Surety Homes Corp., 582 F.2d 1081, 1085 (7th Cir. 1978), the court held that a plaintiff in a comparable situation was entitled as appellee to challenge such a precedent ruling "(f)or the limited purpose of defending the remitted judgment." While this approach may have first blush attractiveness, in view of the now-settled federal rule that a plaintiff who accepts a remittitur may not appeal from the remitted judgment, Donovan v. Penn Shipping Co., 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), we respectfully disagree with it. The rule that prohibits an appellee from attempting to enlarge rights under a judgment is a long-standing and salutary one that serves important ongoing procedural values. We fail to see how allowing an attack on the precedent ruling here has the "limited purpose" of-or is indeed at all necessary to-merely defending the remitted judgment. To allow it is to permit direct circumvention, in any case where the defendant appeals a remitted judgment, of the Donovan prohibition against remitting-plaintiff appellate challenges. Perhaps significantly, the Durant court, reviewing the precedent ruling at appellee's behest, found no error in it
 
 
 [20]
 It is this aspect that distinguishes the instant case from those cited by plaintiff as support for the court's use of remittitur here. In both Bonn v. Puerto Rico Int'l Airlines, Inc., 518 F.2d 89 (1st Cir. 1975), and Jones v. Wittenberg Univ., 534 F.2d 1203 (6th Cir. 1976), remittiturs were upheld in wrongful death actions on the basis that the awards were excessive in their pain and suffering components. In neither, however, had the court erred in submitting this as a compensable item and in both the juries returned special verdicts which broke out the exact amounts awarded for this item. In these cases therefore the maximum amounts attributable to the challenged components were known and the remittitur was simply to reflect a jury excess as to those separable components
 
 
 [21]
 We cannot find the error harmless, as the plaintiff suggests we might, on the basis that the remitted award lies clearly within a permissible total range of properly compensable items. The very problem which makes remittitur improper here is that neither we nor the trial court has any possible way of knowing what amounts may have been assigned by the jury to the various items. For all we can tell the amount assigned the uncompensable item may have bitten into the outer limit of amounts properly, but not necessarily, assigned to compensable items. Under the state wrongful death statute, N.C.Gen.Stat. § 28A-18-2(b)(4) (1981 Supp.), and the court's instructions, several of these are unliquidated
 
 
 [22]
 The sole issue before the district court upon remand is that of compensatory damages. The district court's suggestion that if a new trial were ordered on appeal it would be conducted as to both punitive damage liability and compensatory damages is of no force. The district court denied plaintiffs' motion for a new trial on the punitive damages liability issue, and plaintiffs did not appeal from that order. This ruling, unappealed, was not in consequence subject to defense by Eastern on appeal and Eastern is entitled to have it treated as the law of the case. See F. James & G. Hazard, Civil Procedure § 11.5 (2d ed. 1977)
 
 
 [1]
 Some examples of improprieties are set out here. Mr. Hemric, representing Richard Arnold, had this to say to the jury:
 I'm asking, I'm begging for your sympathy for this man and for all the passengers on that plane.... They (the plaintiffs) are begging for your pity.
 Mr. Diehl, also counsel for Richard Arnold, asked the jury to put itself in plaintiff's shoes:
 Let's talk about compensation a minute. After much squabbling, we got in the photos of the airplane crash, the heat, the wreckage, the fire, the destruction, Richard Arnold-what a guy just out of an airplane looks like burned, burned over 47 percent of his body, third degree, second degree, first degree. We've had a little sunburn. I'm light-skinned. I don't need to do anything but poke my head out and I get burned. Perhaps you've had similar experiences, and Solarcaine takes the pain away. Put a little squirt on and you're okay. You imagine being fried in Eastern Airlines' kerosene and how that feels.... He fought and kicked and got out of the plane. What difference does it make how he got out? It's a miracle that he got out of the plane. They would rather him not have gotten out of the plane. It would be so much easier, but he got out of the plane, and he got out of the plane after being subjected to something that I can't conceive, watching other people waving their hands as they burned to death.
 He later argued:
 I want to use the time I have left to, again, approach the theme of common sense and logic and tell you what I think is the most illogical thing of this trial. The most, the thing to me that makes the least common sense-and I have in my own mind dubbed it Eastern's bad joke-I refer you to the cop-out defense of Eastern Airlines, the attitude that by coming into this courtroom and saying, we admit negligence. We're sorry. We know our pilots crashed the plane. You caught us, caught us in a technicality. They misread an altimeter. We had two of our ace guys up there, ace pilots, and you caught us in this slight transgression and so, for that reason, give them some small amount of compensatory damages and, by the way, folks, there they are, the real culprits, murderers' row over there, the guys that did it. We're sorry, but what we really want to do is cop-out. We want to put the blame on somebody else. We want to sue the air traffic controllers individually for all the carnage and horror we caused. I think that defies logic and common sense. It made Scott Crossfield (witness for plaintiffs) sick. It makes me sick, and, members of the jury, I hope in the bottom of the pit of your stomach it makes you sick that these people would think that they can pull that in a court of law. It is outrageous. It is exemplified by what you saw. Frank McDermott, the man with the bionic ears, he hears things on cockpit voice recorder tapes that nobody else hears, and he comes here to tell you that he hears them to make you think that these pilots were busy flying the airplane, and he hears things on air traffic control tapes to make you think that these guys sat idly by and watched the bird crash and did nothing about it. It is to me the ultimate disgrace of failure to accept responsibility. It's the kind of logic that brought you Leo Marshall. Wonder how long they had to look for a Mr. Marshall? He said he was hired October 24th. That's over five years after this plane crash. They must have searched the countryside for somebody who had been in the air traffic control tower and who would come in and say, I read the reams of paper-it must be that high-and I find in those reams of paper a duty to watch airplanes all the way down, and I also find, based on what I've heard in this courtroom, that these guys breached that duty. Well, folks, for 40 bucks an hour, you can probably get almost anybody to say anything. I don't think there was a bit of merit in anything he said. It's irrelevant to my lawsuit, but it defies logic, and it tells you the attitude, the attitude, the attitude that's still here. I think their strategy backfired. I think it destroyed in your minds the credibility of the great white knight corporation, Eastern Airlines; and if McDermott and Marshall didn't destroy it, then the star witness of the trial, excuse me, I'm getting ready to say something bad about Frank Borman. Please forgive me. The star witness of the trial, Frank Borman, exemplified everything that I'm about in this case. From the moon ride to the TV ads and wherever you see him in the newspapers and magazines, he had the audacity and gall to walk into this courtroom and to tell you the cockpit conversation had absolutely nothing to do with the crash of the plane. We didn't call Frank Borman.... (T)hey needed the luminescence, the glow, John Golding's new-found hero to come here and impress you.... That pompous, he's been to the moon. Congratulations. I've been to Waxhaw, big deal. I'm not an astronaut. I'm not the President of Eastern Airlines, but his attitude made him the star witness of this case, folks. He is why they haven't learned a lesson, he and Captain Brady.... Their conduct, Daniels and Reeves, what they did in that airplane is in wanton and reckless disregard of the rights and safety of the passengers of the airplane. I would be astounded if you don't find that, and I think that's all you need to find; but Borman and Brady, if you want to go back to where that kind of logic comes from, that's where you go. You go right to the top of the airline. The buck stops there. Those guys in 1979 are condoning the very thing that killed 72 people five years ago. It's gross negligence of the pilots and it's gross negligence of this almighty corporation. It's double gross negligence.... Captain Brady, the seed, just like you said, Howard, here comes the oak tree. He told you I was going to say it. He planted the seed of a misread altimeter. Well, I don't think it was the seeds of a misread altimeter. I think what was going on there had been planted long ago. It was cockpit complacency. It was lack of discipline in the most gross, worst sort of way. It is exemplified in 1972 by flying into trees, taking off on the runway in Greensboro in the slush, hold onto your wing, honey, with the stewardess in the cockpit, killing people in the Everglades flying that plane into the ground, a year earlier in Charlotte whacking that 30-foot pole 3500 feet short of the runway, two special surveillances by the FAA, a road show. Did you see it? Where was the road show they bragged about? You didn't see it and Jim Daniels didn't see it, but they made money. They're making money. In 1973 they lost 36 million dollars. In 1974, the year they burned these folks, they made 5.6 million dollars. Need a figure for punitive damages? That is their profit that year, 1974. Did they learn a lesson? No, they're whacking them into the trees in Houston three months later, running off the runway in Buffalo three months later, and in June, 1975, they killed 112 human beings in New York. They learned a lesson. That's the year they lost 50 million dollars, but they are still here, folks. They bounced back from a setback of an economic nature.... Well, I say this to you, it was no seed of a misread altimeter. By the time these guys got around to crashing 212, maiming those people, killing those people, it was an oak tree of indifference, and you ought to cut it down. You ought to crash it to the earth the same way they crashed 212 and, if that appeals to your emotions I hope it does. It's time to stop it. They have not learned. They are here in '79 with the same defense they had five years ago, a misread altimeter. What other aspects of the great oak-McDermott, Leo Marshall-a theory that the air traffic controllers should have been watching and waiting. They should have known Reeves and Daniels were turned loose on the rest of society that morning. It's a mind-set that comes into this court and tells you that if other people crash airplanes it's okay for us to crash airplanes. It's got big, strong branches, this old oak that you need to take down, with witnesses in it like Sandy Sanderson, the pilot who flew the plane into the bay, National pilot. He flew the plane into the bay, and they brought him to say it's okay to fly the plane into the bay. Maybe that's why they wanted to acquire National Airlines, wanted to get Sandy on the payroll. Can you imagine getting in an airplane one morning, an Eastern jet, and they come on, welcome aboard Eastern Airlines, Captain Sanderson, Captain Daniels in the cockpit. Instead of passing out coffee, I assume they would roll down and hand out altimeters for the passengers. How sick would you be with that kind of logic? .... If you want to give them a message, you're going to have to hit them in the pocketbook in a way they understand. Killing people and maiming people is something they have gotten immune to as a part of doing business.
 Mr. Pangia, representing the government, stated:
 Then they have the nerve to come in here-look at the caliber of the evidence-they come in here and put another pilot on the stand that says, yes, I went with my bus, speeding down the road, driving recklessly, and I crashed and I killed a couple of people. It happens all the time. Like a bank robber taking the stand and bringing in another bank robber and saying we rob banks all the time, it's okay. I haven't robbed a bank for three weeks now, I don't think I should be punished. That's the testimony you heard here. And the tragedy of this case, the tragedy of this case, ladies and gentlemen, is not just what happened here. This is not some recalcitrant teenager or some hoodlum out in the street that says it's somebody else's fault, or a lot of hoodlums go out and rob people or a lot of people drive recklessly. This is an attitude endorsed by a major corporation of coming in here and trying to pull a cop-out. It's an attitude of a major corporation and when we tolerate that in this country, it's the beginning of the end.
 You know what this case here is all about? This case is all about a bus driver, taking passengers on in the bus, driving down the street, speeding and driving recklessly, and having a crash and killing and maiming people, and then the bus driver goes to the police station and sues the policeman for not catching him on the radar trap. That's what this case is all about. Then yesterday I hear Mr. Barwick come up here and talk about fairness, oh, be fair to us, that you should be fair, we shouldn't be punished for our wrongdoings. 35 million, 960 thousand 8 hundred 68 dollars plus interest against each one of these individuals (the air traffic controllers), plus interest. They also sued for costs. They also want them to pay for costs of this whole shooting match. That's what they sued them for. Fairness they talk about. Don't hurt us, we're just a little poor airline, with leverage of two million dollars and, as the evidence showed, offered to buy National Airlines for 342 million dollars, and they say that is going broke. Treat us fairly, but sue them, get them for 35 million, nearly 36 million dollars each. I guess they figure they could borrow it.
 And then they talk about the fairness, about the settlements that they have made, and that they are suing for their settlement in part they want from the air traffic controllers. They were dragged into a courtroom. The government was not involved in that case. Eastern was dragged into the courtroom and there was a case. They did not want to pay, those passengers had to sue them, and then they talk about fairness.
 Now Mr. Barwick, when he came up here to argue, didn't mention that Eastern as well as its insurers is looking to pass the buck to these air traffic controllers. He didn't mention that. Maybe he's ashamed of it, and rightfully he should be because it's not fair to come up here and try to make you feel sorry for Eastern Airlines while doing what they're trying to do to these people for doing their job. Yes, I'm angry. And then they couldn't understand why the plaintiffs here, the people that were injured in this terrible accident, people that were hurt, lost loved ones in this terrible accident, why they have not sued the air traffic controllers. That was beyond their comprehension. Why, they haven't come up with some kind of a reason. Well, maybe they're honest.
 Mr. Smiley, representing all three plaintiffs, argued:
 We all heard those tapes long before the decision to file this lawsuit was made. The reason we did not sue the government is an extremely simple one. They aren't liable, and we have a duty to this Court and our clients not to undertake to sue people or the government when there isn't any liability. It's a duty imposed upon us as officers of the court, and we believe it, and that's why we didn't do it, and we wouldn't do it today.
 And Mr. Pangia argued again:
 I pray that you view this evidence, understand it sufficiently to do the right thing here. Mr. Rutherford, or the gang over here has an hour and a half after me. I will not have a chance to come back and refute. Those are the rules which we have laid out. So this is the last time I have to talk to you, and I just pray that you end this three year nightmare for these gentlemen (the air traffic controllers). Their reputation in the community, facing their families, you know what it's like to go home with a lawsuit like that to live with for three years. They have been literally held as hostages for three years. Try to go to a bank and make a loan, try to buy a car and have to explain....
 COURT: I don't believe we heard any evidence about that.
 MR. PANGIA: End the nightmare, please.
 
 
 [2]
 Consolidation for trial of the insurance company claims and the Eastern Airlines impleader would have been possible, without the threat, promptly followed by the actuality, of prejudice to one of the parties. That approach would have permitted the handling of all cases and claims in only two trials. The situation, it seems, developed into one where a good idea was pushed one step too far
 
 
 [3]
 On August 23, 1979, well before the commencement of trial, the district judge stated:
 I intend to have only one more trial on all the fact issues in these cases. I intend to try them all in three weeks or less.
 ... I do not intend to have any separate trials later on the issues between the original defendants on the one hand and the air line controllers and the government on the other. That case will be disposed of in the same factual inquiry.
 
 
 [4]
 Thoroughly analyzed in S. J. Peters, Improper Argument of Counsel: City of Cleveland v. Peter Kiewit Sons' Co., 12 Toledo L.Rev. 761 (1981)