**Diana L. MASON, Individually and as Administrator of the Estate of Otis W. Mason, Deceased, Plaintiff–Appellee,**

v.

**TEXACO, INC., Defendant–Appellant.**

**Nos. 90–3250, 90–3278.**

United States Court of Appeals, Tenth Circuit.

Nov. 18, 1991.

Gerald L. Michaud of Michaud, Hutton & Bradshaw and Richard D. Cordry of Cordry & Hartman (Marlys A. Marshall with them on the brief), Wichita, Kan., for plaintiff-appellee.

Joseph W. Morris (James M. Sturdivant and Richard B. Noulles with him on the brief) of Gable & Gotwals, Tulsa, Okl., and Ken M. Peterson (Robert W. Coykendall and Diane S. Worth with him on the brief) of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan. (Arthur R. Miller, Harvard Law School, Cambridge, Mass., and Eric W. Wiechmann and William H. Narwold of Cummings & Lockwood, Harford, Conn., with them on the brief), for defendant-appellant.

Before McKAY, Chief Judge, BARRETT and BRORBY, Circuit Judges.

BARRETT, Senior Circuit Judge.

Texaco, Inc. (Texaco) appeals from a products (benzene) liability judgment following a jury trial, awarding plaintiff Diana L. Mason, (Mason), individually and as Administrator of the Estate of Otis W. Mason, (Butch), Deceased, $9,025,000 in actual damages, and $25,000,000 in punitive damages. The claims of personal injury and wrongful death were based upon Mason's contention that her husband, Butch, developed leukemia and died after being exposed to benzene produced and marketed by Texaco. Jurisdiction was based upon diversity of citizenship. 28 U.S.C. § 1332. Texaco moved for a judgment notwithstanding the verdict or for a new trial. The motion was denied. This appeal followed.

Our jurisdiction vests under 28 U.S.C. § 1291. Substantially for the reasons set forth in the district court's well-reasoned, 47-page "Opinion and Order Denying Defendant's Post Trial Motion," *Mason v. Texaco, Inc.*, 741 F.Supp. 1472 (D.Kan. 1990), (*Mason*), we affirm with one exception. We shall remand to the district court with directions to enter a remittitur order on the award of punitive damages.

*Background*

In June, 1974, Butch and his young wife and child left Wichita, Kansas, for Yorktown, Virginia, where Butch had decided to serve in the United States Coast Guard. As a student in training, Butch was first exposed to benzene in the water and sediment class. He was taught to use a test kit sold by Gerin Corporation which was designed and used to test the levels of water and sediment in engine oil used in Coast Guard vessels. Benzene was a solvent used as a component of the test. Thereafter, commencing in October, 1974, Butch taught the course. He was exposed to a high dosage of benzene while conducting the Gerin lube oil test. He was last exposed on January 10, 1977.

During the time period of Butch's exposure to benzene, Texaco's sole warning of the health hazards of its benzene was contained in a Material Safety Data Sheet (MSDS) which stated that "High concentrations may cause anthestic [sic] effects; prolonged chronic excessive exposure may damage blood forming organs." The same MSDS stated that 25 parts benzene per million (ppm) was the maximum safe exposure limit and that "adequate ventilation" or "local exhaust" should be used. It was not until 1979, some two years after doctors had diagnosed Butch's illness as acute myelocytic leukemia and after various agencies and/or institutes and scientific/medical publications had clearly identified the causal connection between benzene

exposure and cancer, that Texaco stated that benzene was "suspected" of causing leukemia.

Butch filed suit on August 14, 1978, against the Gerin Corporation, the manufacturer of the kit used to test properties of motor oil. By later amendments, claims were also asserted against Dooner & Smith Chemical Company, Mellen Chemical, Inc., Ashland Chemical Company and Texaco, all suppliers of benzene. At trial, only Texaco and Ashland remained as defendants. At the conclusion of plaintiff's case, Ashland's motion for a directed verdict was granted. The case was thus submitted against Texaco, although the other parties, with the exception of Ashland, were named on the verdict form for comparative fault purposes.

Butch died from leukemia on December 10, 1979. Mason was substituted as plaintiff in the personal injury action for pain and suffering and as plaintiff/administrator of Butch's estate in the wrongful death action. As regards the defendants, it was alleged that Butch had been exposed to benzene, manufactured and/or distributed by them and that they had failed to properly and adequately warn him of the cancer risks from benzene exposure.

At the conclusion of the four-month trial, the jury answered official verdict interrogatories, finding by a preponderance of the evidence, that: Butch's leukemia was caused by exposure to benzene; the benzene which caused Butch's leukemia was produced by Texaco; Texaco either knew or should have known of scientific knowledge that benzene was considered to be cancer causing at the time of Butch's exposure; Texaco's actions were insufficient to warn its immediate purchaser of benzene of its cancer propensity; Texaco did not take reasonable measures to determine that its immediate purchaser, Mellen, was capable of conveying adequate warning to others in the chain of distribution of benzene; and, Texaco's failure to adequately warn Mellen or to take reasonable measure to see that Mellen passed on an adequate warning was a direct cause of Butch's leukemia.

Based upon fault at one hundred percent, the first jury attributed fault as follows:

Otis Mason 3%

U.S. Coast Guard 26%

Gerin Corporation 25%

Dooner and Smith 5%

Mellen Chemicals 6%

Texaco, Inc. 35%

The jury determined that the total actual damages on the wrongful death claim amounted to $3,500,000 based upon pecuniary damages of $3,475,000 and non-pecuniary (a $25,000 maximum under Kansas law) of $25,000. In addition, the jury returned a personal injury verdict of $5,000,000. The jury found that it was not appropriate to award punitive damages. Mason's motion for a new trial on the jury's denial of punitive damages was denied.

Texaco appealed. Mason did not cross-appeal from the district court's denial of her motion for new trial on the jury's denial of an award of punitive damages. This court reversed and remanded for a new trial because of erroneous jury instructions which obligated Texaco, contrary to Kansas law, to take reasonable steps to "see that its distributor knew and complied with its duty to inform," and to "instruct and train [its] salesmen" in conveying the health warning. We concluded that these instructions imposed a greater duty on Texaco than Kansas law required. *See Mason v. Texaco, Inc.*, 862 F.2d 242, 246–48 (10th Cir.1988), (*Mason I*). Our remand was general, reading "The judgment against Texaco is REVERSED and the case is REMANDED for a new trial." *Id.* at 250.

Upon remand, Texaco filed a motion to preclude the submission of punitive damages to the jury on retrial. Texaco argued then, as it does now, that the unappealed finding/ruling on punitive damages became the law of the case as a consequence of Mason's failure to preserve the issue by cross-appeal. The trial court denied Texaco's motion, finding that resubmission of the issue of punitive damages upon retrial was appropriate.

Following many pre-trial motion hearings and depositions, retrial commenced on Sep-

tember 26, 1989, and concluded with special verdict accompanied by interrogatories on January 24, 1990, approximately a four-month trial. The jury answered special verdict interrogatories, finding that by a preponderance of the evidence: Butch's leukemia was caused by his exposure to benzene; the benzene produced by Texaco was the cause of Butch's leukemia; the benzene produced by other manufacturers did not contribute in part to Butch's leukemia; Texaco knew or should have known at the time of Butch's exposure to benzene that there existed scientific knowledge that benzene was cancer-causing; the actions taken by Texaco were insufficient and inadequate to warn Texaco's immediate purchaser, Mellen, of the dangerous carcinogenic propensity of benzene; Texaco did not take reasonable measures to determine that its immediate purchaser, Mellen, was capable of conveying adequate warning to others in the chain of distribution of benzene; Texaco's negligent failure to warn caused, either in whole or in part, Butch's exposure to benzene; and, considering all of the fault at one hundred percent, the evidence dictates that Texaco was 100% at fault and that none of the fault, as a contributing cause to Butch's leukemia, was attributable to Ashland Chemical, Union Amoco, Mellen Chemicals, Dooner & Smith, Gerin Corp., U.S. Coast Guard or Butch.

The jury awarded Mason and her children $5,000,000 pecuniary damages and $25,000 (maximum allowable) non-pecuniary damages in their wrongful death action. The jury also awarded $4,000,000 for personal injuries suffered by Butch before his death. Finally, the jury awarded $25,-000,000 against Texaco as punitive damages.

The district court entered judgment in favor of Mason for $9,025,000 compensatory damages and $25,000,000 in punitive damages for a total award of $34,025,000. Texaco moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The motion was denied by the district court. See *Mason, supra.*

### Contentions on Appeal

On appeal, Texaco contends that: (1) the trial court erred in retrying punitive damages, (2) because the Coast Guard's fault was undisputed, the trial court committed multiple critical errors in denying Texaco's motions for a directed verdict, judgment notwithstanding the verdict, or for a new trial, (3) the trial was permeated with error that cumulatively precluded Texaco from receiving a fair trial and constitutes reversible error, (4) the trial court erred by permitting speculation as to the source of benzene and by coercing the jury to reach a decision on that issue, and (5) the jury's findings of $9,025,000 actual damages and $25,000,000 punitive damages are excessive.

The appellate contentions of error were raised and presented to the trial court in Texaco's motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The district court dealt with each contention in detail in *Mason, supra.* Because we affirm, with one exception, substantially for the reasons set forth in *Mason, supra,* our discussion shall be simply supplemental.

### I.

Texaco argues that the trial court erred in retrying punitive damages. We review issues of law *de novo. Boise City Farmers Co-op v. Palmer,* 780 F.2d 860, 866 (10th Cir.1985).

In support of its argument, Texaco contends that (a) established principles of finality and fundamental fairness prohibited a retrial of punitive damages, (b) the first trial afforded Mason a full and fair hearing of her punitive damage claim, (c) Mason had an obligation to cross-appeal to prevent the punitive damage determination from becoming final, (d) special jury verdicts, not infected by error, uniformly are given effect on retrial, (e) the only case directly on point prohibits retrial of punitive damages, (f) policies of fairness, judicial economy, and encouraging repose support limiting retrial of issues specifically decided, and (g) the improper relitigation of punitive damages made a fair trial of Texaco's liability

and the amount of actual damages impossible.

Although we shall discuss and decide Texaco's contentions, we observe that a decision rendered by this court which was not available to the district court or to the parties when they prepared their opening and reply briefs on appeal, controls the issue of the scope of the retrial in *Mason* and fully justifies the trial court's decision to retry the issue of punitive damages. That decision is *Wheeler v. John Deere Co.,* 935 F.2d 1090 (10th Cir.1991).

In *Wheeler,* also a products liability diversity case, the jury found defendant John Deere 75% at fault and plaintiff Wheeler's employer 25% at fault. The jury calculated Wheeler's total damages at $3.1 million. The court entered judgment against John Deere for $2.3 million. Defendant John Deere appealed. We reversed and remanded for a new trial, holding that the trial court committed reversible error in key evidentiary rulings. *See Wheeler v. John Deere Co.,* 862 F.2d 1404, 1415 (10th Cir. 1988).

At the second trial, the jury found John Deere 68% at fault and Wheeler's employer 32% at fault. The jury assessed damages at $2,883,407. The district court entered judgment against John Deere in amount of $1,960,717. Plaintiff Wheeler appealed, contending, *inter alia,* that because John Deere did not appeal from the first jury's damages award of $2,325,000, he was entitled to that sum instead of the second jury's award of $1,960,717. We rejected this contention and held:

> This argument overlooks our reversal in *Wheeler I.* To 'reverse' a judgment means to 'overthrow, vacate, set aside, make void, annul, repeal, or revoke it.' *Black's Law Dictionary,* 1319 (6th Ed. 1990). A judgment reversed by a higher court is 'without any validity, force or effect, and ought never to have existed.' *Butler v. Eaton,* 141 U.S. 240 [11 S.Ct. 985, 35 L.Ed. 713] ... (1891). *See Leroy v. City of Houston,* 906 F.2d 1068, 1076 (5th Cir.1990); *Rika v. Int'l Tel. & Tel. Corp.,* 533 F.2d 1053, 1054 (8th Cir.1976). Reversal of a judgment and remand for a

new trial places the parties in the same position, insofar as relief is concerned, as if the case had never been tried. *See Gospel Army v. Los Angeles,* 331 U.S. 543 [67 S.Ct. 1428, 91 L.Ed. 1162].... (1947).

> In *Wheeler I,* we 'reverse[d] the judgment of the district court and remand[ed] for a new trial.' 862 F.2d at 1415. Once we reversed the original judgment incorporating the first jury's verdict and our mandate issued, the first verdict became null and void in its entirety. The district court could no more reinstate the damages portion of the first verdict than it could substitute the second jury's award with a larger sum pulled out of a magically appearing hat. *See* Dr. Seuss, *The 500 Hats of Bartholomew Cubbins* (1938).

935 F.2d at 1096.

Texaco, in its "law of the case doctrine" argument, points to the case of *Arnold v. Eastern Air Lines,* 681 F.2d 186 (4th Cir. 1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983) as "an indistinguishable case." (Appellant's Brief, p. 19). We disagree.

*Arnold* involved, *inter alia,* a wrongful death action brought by the personal representative of a passenger who was killed in an airplane crash near Charlotte, North Carolina. Eastern, unlike Texaco, admitted liability based on "the failure of the pilots to be aware of the plane's altitude immediately prior to the crash." Plaintiff sought both compensatory and punitive damages. Eastern's pleadings conceded liability and, thus, unlike Texaco, responsibility for compensatory damages. However, Eastern denied liability for punitive damages. The *Arnold* jury returned a plaintiff's verdict for $847,000 in compensatory damages but denied punitive damages. Post-trial motions were denied, including plaintiff's motion for new trial on the punitive damage issue.

However, the trial court determined that it had erred in submitting decedent's pain and suffering damage claim to the jury because there was insufficient evidence that decedent had survived the crash even

momentarily. On that basis, the trial court ordered a new trial on the compensatory damages claim alone, conditioned upon plaintiff's refusal to accept a remittitur of $50,000. The plaintiff accepted the remittitur, and the court entered judgment in the reduced sum of $797,000.

On appeal, the court reversed, holding that: (1) the remittitur devise was improper, but plaintiff, as appellee, having accepted the remittitur, was limited to defending the judgment as entered and could not enlarge her rights under it, and (2) upon remand the district court should conduct a new trial limited to the issue of compensatory damages only. The court observed that "The district court denied plaintiff's motion for a new trial on the punitive damages liability issue, and plaintiffs did not appeal from that order. This ruling, unappealed, was not in consequence subject to defense by Eastern on appeal and Eastern is entitled to have it treated as the law of the case. *See* F. James & G. Hazard, Civil Procedure 11.5 (2d ed. 1977)." *Id.* at 206.

The instant case and *Arnold* are strikingly different. First, in *Arnold* the remand order specifically limited the new trial to determination of compensatory damages only. *Mason I*, on the other hand, was a general remand for new trial because of erroneous jury instructions as to Texaco's duty to warn and to train salesmen. 862 F.2d at 250. Thus, the entire question of Texaco's liability was at issue upon retrial. Secondly, plaintiff in *Mason* was not offered nor did she accept a remittitur of compensatory damages. Finally, and most significant, Texaco, unlike Eastern, challenged any liability on its part.

■ In *Mason I*, this court reversed and remanded for a new trial on the sole basis that the trial court's liability instructions imposed an impermissibly high duty to warn on Texaco. Our remand was general. This court observed that the additional issues raised by Texaco on appeal (beyond the liability instructions) were all "fact bound" and that extensive discussion thereof would be "unproductive." *Id.* Thus, as to those "additional issues," there was no appellate court determination thereof. On

that predicate, there is no reason to believe that this court would have addressed the issue of punitive damages even had it been raised on cross-appeal by Mason. It, too, would have been treated as "fact bound."

When this court issued its general mandate in *Mason I*, we reversed the first judgment and remanded for a new trial on all "fact bound" issues without limitation. Certainly liability and damages were "fact bound" issues for jury determination. Thus, the trial court, upon remand, did not abuse its discretion in ruling that all issues of liability and damages were matters to be resolved by the jury.

In *Hicks v. Gates Rubber Co.* 928 F.2d 966, 971 (10th Cir.1991), we held that "[W]hen the further proceedings are specified in the mandate the district court is limited to holding such as are directed. When the remand is general, however, the district court is free to decide anything not foreclosed by the mandate."

And in *K-B Trucking Co. v. Riss Intern. Corp.*, 763 F.2d 1148, 1163 n. 22 (10th Cir. 1985), we stated:

> A new trial on part of the issues is appropriate where 'it clearly appears that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice.' *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Professors Wright and Miller explain that
>
> > if an error at the trial requires a new trial on one issue, but this issue is separate from the other issues in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue. *Perhaps the most common example is the grant of a new trial limited to damages when liability has been properly determined.* 11 C. Wright & A. Miller *Federal Practice and Procedure* § 2814 at 93 (1973) (footnotes omitted); *see also* J. Moore and J. Lucas, *Moore's Federal Practice,* ¶ 59.06, at 59–56 to 59–58 (1984). Professors Wright and Miller note that 'a new trial on dam-

ages only is not proper if there is reason to think that the verdict may represent a compromise among jurors with different views on whether defendant was liable or if for some other reason it appears that the error on the damage issue may have affected the determination of liability.' (Emphasis supplied).

In *Gasoline Products Co. v. Champlin Refining Co., supra,* at 500, 51 S.Ct. at 515, the Court reasoned that a new trial could not be based on part of the issues because "[h]ere the question of damage on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of fair trial." In *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18, 21 (10th Cir.1972), we reversed and remanded for a new trial on the damages issue only, holding that the liability issue was properly determined and the issues were not intermingled.

In *Delano v. Kitch,* 663 F.2d 990 (10th Cir.1981), we held that in conducting a retrial, the trial court should follow rulings of law previously made by the court of appeals. That mandate was faithfully followed by the trial court in this case. Under the "law of the case" doctrine, the district court may not deviate from the appellate court's mandate; however, the district court may reconsider an issue and disregard the appellate court mandate if the subsequent trial produces substantially different evidence. *Lindsey v. American Cast Iron Pipe Co.,* 810 F.2d 1094 (11th Cir.1987). We observe that Mason cites to *Gertz v. Robert Welch, Inc.,* 680 F.2d 527 (7th Cir.1982) for the rule that the law of the case doctrine does not apply where the evidence on retrial is substantially different than that presented at the original trial and contends:

It cannot seriously be argued that the evidence upon retrial of this case mirrored that presented in the first. Indeed, the second trial so substantially and significantly varied from the first as to prevent meaningful comparison. As defendant must surely concede, the cultivation and development of an entirely new liability or causation expert radically altered the evidence heard by the jury. Defendant's emphasis on a theory of defense virtually ignored in the first trial, i.e., that toluene was substituted for benzene by Gerin Corporation, in addition to its new theory on the supply issue, combined to change the complexion of the case beyond recognition. Defendant in this trial shifted the focus almost exclusively to proving Texaco's product never reached Butch Mason at all.

(Appellee's Brief, p. 13).

Among the law of the case rules is the obligation of every court to honor the rulings of a court that stands higher in the hierarchical judicial structure. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 4478 at 788. No violation of that rule occurred in this case. The law of the case doctrine posits that "[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). "The doctrine of law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan,* 440 U.S. 332, 347, n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979). Furthermore, the law of the case doctrine is solely a rule of practice and not a limit on the power of the court. *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). *See also Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981) (law of the case doctrine is not an "inexorable command" but a rule to be applied with good sense).

"The rule of the law of the case is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. U.S. Smelting Ref. & Mining Co.,* 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950). *See also, Fox v. Mazda Corp. of America,* 868 F.2d 1190, 1194 (10th Cir.1989); *Gage v. General Motors,* 796 F.2d 345, 349 (10th Cir.1986).

■ A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case. It is part and parcel of a liability determination and does not have any independent being until a jury has decided, based on the preponderance of the evidence, that not only was a defendant's conduct negligent, but that it was gross, willful, wanton or malicious. Proof of gross, willful, wanton or malicious conduct by a defendant is not separate from proof of a defendant's negligence. The evidence proving negligence establishes liability and the degree of negligence is determinative in the award of punitive damages. Upon remand in this case, the entire issue of liability was subject to retrial. It was in fact resubmitted to the jury in a hard fought contest.

In light of our holding in *Wheeler v. John Deere Co., supra,* and the law of the case doctrine, we hold that the trial court did not err in permitting retrial of the punitive damages claim.

## II.

Texaco contends that because the Coast Guard's fault was undisputed, the trial court committed multiple critical errors in denying Texaco a directed verdict, judgment notwithstanding the verdict, or a new trial. Texaco argues that the Coast Guard's wrongful conduct was an effective intervening and superseding cause of Butch's injuries and that the jury's failure to find that the Coast Guard was at fault required that the trial court grant Texaco a new trial.

In *Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990), we stated our standard of review, which is controlling here:

We review *de novo* the denial of a motion for judgment notwithstanding the verdict, applying the same standard of review as that used by the district court. *See, Guilfoyle v. Missouri, Kansas & Texas R. Co.,* 812 F.2d 1290, 1292 (10th Cir.1987). 'Although we have often used different phraseology to express this standard,' the inquiry is best summarized as 'whether there is evidence upon which the jury could properly find a verdict for

the party [against whom the motion is directed].' *Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495, 498–99 (10th Cir.1984) (footnote omitted) (quoting 9 C. Wright & A. Miller, *Federal Practice and procedure,* 2524 at 543 (1971)). In making that determination, we are obligated to view 'evidence and inferences most favorably to the nonmoving party,' *Zimmerman v. First Fed. Sav. & Loan Ass'n.,* 848 F.2d 1047, 1051 (10th Cir. 1988).

Because the directed verdict/judgment notwithstanding the verdict inquiry asks whether there was evidence such that the jury could have *properly* found for the party against whom the motion is made, we must necessarily frame our analysis in terms of the underlying burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 [106 S.Ct. 2505, 2512, 91 L.Ed.2d 202] ... (1986). ('We are convinced that the inquiry involved in a ruling necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits').

And in *Crysco Oilfield Serv. v. Hutchison–Hayes Intern.,* 913 F.2d 850–51 (10th Cir.1990), we stated:

In order to reverse the trial court's decision on a motion for directed verdict, we must find that 'the evidence points but one way and is susceptible to no reasonable inferences supporting the party [opposing the motion]; we must construe the evidence and inferences most favorably to the nonmoving party.' *Zimmerman v. First Federal Sav. & Loan Ass'n.,* 848 F.2d 1047, 1051 (10th Cir. 1988).

In *Transpower Constructors v. Grand River Dam Auth.,* 905 F.2d 1413, 1416 (10th Cir.1990), we observed:

We will reverse the trial court's denial of either motion [a directed verdict and for judgment n.o.v.] only if, after a *de novo* review, we determine that the evidence taken in the light most favorable to the nonmoving party and all reasonable inferences to be drawn therefrom point but one way, in favor of the moving

party. *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 467 (10th Cir.1990).

▇ Finally, we have held that the trial court's discretion as to whether to grant a new trial will not be disturbed on appeal absent an abuse of discretion. In *Garrick v. City and County of Denver*, 652 F.2d 969, 971 (10th Cir.1981), we required a "strong showing" of the trial court's abuse of discretion. *See also Meyers v. Ideal Basic Industries, Inc.*, 940 F.2d 1379, 1383 (10th Cir.1991); *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir.1989).

▇ Our review of the entire record on appeal leads us to conclude that there was in fact a genuine dispute relative to the Coast Guard's fault. We hold, based on our review, that the jury could conclude, as surely it did, that the Coast Guard did not know that benzene induced or caused leukemia during the time of Butch's exposure thereto. We agree with the trial court's careful review of the evidence relative to this issue. *See Mason*, 741 F.Supp. at 1484–87.

### III.

Texaco argues that it was denied a fair trial due to the cumulative effect of erroneous rulings by the trial court in (a) barring cross-examination as to the credibility of plaintiff's experts, (b) allowing plaintiff to present irrelevant and highly prejudicial evidence of OSHA benzene hearings and of "other deaths" allegedly caused by the OSHA delay in lowering the occupational benzene exposure standard, (c) finding as a fact that key testimony from the first trial had been transcribed correctly, and (d) precluding cross-examination of the plaintiff regarding her inconsistent statements in prior pleadings.

▇ "A district court possesses considerable discretion in governing the presentation of evidence, and its decisions will not be disturbed absent manifest injustice to the parties. *See Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir.1987); *see also Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 324 (10th Cir.1989)." *Comcoa, Inc. v. NEC Telephones, Inc.*, 931 F.2d 655, 633 (10th Cir.1991). "The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Wheeler I*, 862 F.2d at 1408." *Wheeler v. John Deere Co., supra*, 935 F.2d at 1099. "[T]he admission of evidence is largely a matter of the district court's discretion. In the absence of manifest error, we will not reverse the district court's decision to admit [refuse admission of] evidence." *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1365 (10th Cir.1987).

Among its contentions of error, Texaco asserts that the trial court erred in denying it the right to cross-examine the credibility of Mason's two expert epidemiologists, Drs. Wagoner and Infante. These experts were critical of Texaco's methodology in formulating its MSDA warning. They opined that it was inadequate and that because exposure to benzene at low levels was known to cause leukemia in 1973, a prudent manufacturer of benzene would not have relied on Texaco's MSDA warning. In order to attack the credibility of Drs. Wagoner and Infante, Texaco sought, during cross-examination, to question them relative to hearsay documents prepared by other expert epidemiologists which were highly critical of a study and conclusions made by Drs. Wagoner and Infante relative to the carcinogenicity of beryllium.

Texaco argues that "[h]ad Texaco been allowed to question Infante and Wagoner about the reviews of their beryllium study, it would have been obvious to the trier of fact that these scientists were biased advocates who consistently have misrepresented data in order to reach desired conclusions. It certainly bore on their qualifications to represent views of the 'scientific community.'" (Brief of Appellant, p. 50).

Texaco contends that "the court erred in prohibiting this classical line of impeachment cross-examination. Rule 608(a) [Fed. R.Evid.] permits an attack on credibility by using the evidence Texaco attempted to offer. Rule 608(b) also provides that specific instances of a witness' conduct, if probative of his character for truthfulness or untruthfulness, are admissible to attack

that witness' credibility." (Brief of Appellant, p. 49).

■ The hearsay documents Texaco relied upon related to challenges to Mason's experts concerning research in a field completely unrelated to benzene. These documents challenged Drs. Wagoner and Infante solely relating to their research conducted on beryllium. This evidence was inadmissible for several reasons. First, the authors of the documents relied upon by Texaco were not present or subject to cross-examination. Secondly, the documents do not challenge (Rule 608(a)) Dr. Wagoner's and Dr. Infante's character for truthfulness or untruthfulness, but rather, and only, their objectivity in the beryllium study.

A trial court has broad discretion in determining whether evidence is properly admitted for impeachment purposes. *United States v. Brandon*, 847 F.2d 625, 629 (10th Cir.1988).

In *United States v. Bowie*, 892 F.2d 1494, 1501 (10th Cir.1990), we stated that:

We might agree with this proposition if all prior incidents were more directly related to the instant case. The only possible trial use of the prior incident, however, was as evidence of a specific instance of the conduct of the witness' credibility. Such instances may never be proved by extrinsic evidence, and they can be inquired into on cross-examination only in the discretion of the trial court. Fed.R.Evid. 608(b); *see generally McCormick on Evidence*, § 42 (E. Clearly 3d Ed.1984).

In *United States v. Bedonie*, 913 F.2d 782, 802 (10th Cir.1990), we defined the purpose of 608(a) evidence:

Fed.R.Evid. 608(a) permits a party to attack the credibility of a witness by evidence in the form of opinion or reputation as to the witness's character for truthfulness or untruthfulness. The admission of this type of evidence is left to the sound discretion of the district court, which must also determine whether the evidence passes the rule 403 balancing test.

*See also United States v. Rios*, 611 F.2d 1335, 1350 (10th Cir.1979).

In *United States v. Morales–Quinones*, 812 F.2d 604, 613 (10th Cir.1987), we defined the scope of 608(b) cross-examination:

Under Fed.R.Evid. 608(b), a defendant may impeach a Government witness by cross-examining him about specific instances of conduct not resulting in conviction if such conduct is probative of the witness' character for truthfulness or untruthfulness. Such inquiry is within the discretion of the trial court subject to rule 403. *United States v. Girdner*, 773 F.2d 257, 261 (10th Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1379 [89 L.Ed.2d 605] ... (1986)....

In *United States v. Atwell*, 766 F.2d 416, 420 (10th Cir.), *cert. denied*, 474 U.S. 921, 106 S.Ct. 251, 88 L.Ed.2d 259 (1985), we affirmed the district court's refusal to permit the defense to cross-examine a prosecution witness concerning his prior arrests which did not result in convictions and held:

The appellant argues that Federal Rules of Evidence 608(b) compels the admission of the evidence of the arrests because they bear on Holden's truthfulness. Rule 608(b) does no such thing. The trial court in its discretion may allow inquiry into the prior conduct of a witness concerning his character for truthfulness. The rule does not require inquiry. Additionally, Rule 608(b) is still subject to the balancing under Rule 403 mentioned above.

Here, the "specific instances of conduct" by Mason's experts sought to be introduced by Texaco related to the beryllium study rather than the benzene study. This is a far cry from expert testimony or other impeachment evidence attacking the scientific propriety of the methodology employed by Drs. Wagoner and Infante in their benzene study and report.

We have carefully reviewed the record, the parties' briefs and the district court's decision. See *Mason*, 741 F.Supp. at 1495–1501. We hold and conclude that none of the trial court's challenged evidentiary rulings constituted a clear abuse of discretion, manifest error, or reversible error.

## IV.

Texaco contends that the trial court erred by permitting (jury) speculation as to the source of benzene to which Butch was exposed to. This matter was thoroughly discussed in *Mason*. *Id.* at 1479–81. We agree with the trial court's reasoning.

Texaco argues that the jury was obviously guessing and speculating on its finding/conclusion that Butch had been exposed only to Texaco's benzene when, on the sixth day of jury deliberation, it sent a note to the court stating that it had become "locked" on question No. 2. Question No. 2 asked "Do you find by a preponderance of the evidence that the benzene produced by Texaco was a cause of Mason's leukemia?" The jury note to the court asked: "Why does question No. 2 on the verdict form have to be 100% yes or no when question number 8 has a place for a percentage of blame?"

Texaco contends that the trial court, rather than accepting the jury's statement that it was hung, issued a modified *Allen* instruction improperly telling the jury that "from my observation, the issues in this case can be decided on a preponderance of the evidence without difficulty." Texaco argues that this instruction impermissibly coerced or influenced the jury to find for plaintiff on this issue. Texaco asserts that when the trial court instructed the jury that it "reserved the right of course to comment or do whatever is necessary by way of further instruction to help the jury reach a verdict" that the court, in effect, advised the jury that it would not permit them to hang.

Immediately after the court gave its *Allen* instruction, the foreman of the jury requested dismissal, on the basis that the stress of deliberations was threatening to his health. Texaco requested leave to question the jury foreman. The court denied the request, dismissed the foreman and denied Texaco's motion for mistrial. Texaco argued that by dismissing the jury foreman, it was denied a unanimous verdict under Fed.R.Civ.P. 48. We find no error in the trial court's *Allen* instruction or the dismissal of the jury foreman.

### (a)

 In *Reazin v. Blue Cross and Blue Shield of Kansas*, 899 F.2d 951, 978 (10th Cir.1990), we reiterated the rule laid down in *United States v. McKinney*, 822 F.2d 946, 951 (10th Cir.1987) that although the preferred procedure is that an *Allen* instruction be given at the same time as other instructions, it is not a per se rule, and the coercive effect of the *Allen*-type instruction must be determined on a case-to-case basis. Texaco does not point to any specific error in the trial court's *Allen* instruction; rather, Texaco argues that the giving of the instruction was coercive in light of the jury's inability to resolve the evidence as to whether Texaco's benzene was the cause of Butch's leukemia.

Contrary to Texaco's contentions, we do not discern any evidence or any reasonable inference that the jury was deadlocked on this issue. The jury's correspondence with the court asked "why does question No. 2 on the verdict form have to be 100% yes or no when question number 8 has a place for a percentage of blame?" The jury was obviously confused about the verdict form. In response to this question, the trial court properly instructed the jury that even should the jury answer question No. 2 in the affirmative (i.e., that benzene produced by Texaco caused Butch's leukemia), this does not answer the question of whether Texaco was at fault for causing such exposure, nor does it answer the question of the percentage of fault attributable to Texaco and other parties.

We hold that the trial court did not commit reversible error in giving the *Allen* instruction. It was not coercive. The trial court's statement that all issues in the case could be resolved was not coercive and it did not "virtually direct a verdict against Texaco on the issue of who supplied the benzene." (Brief of Appellant, p. 65). The jury continued to deliberate for another six days. That, in itself, dilutes any indicia of coercion on the part of the trial court. *See Reazin v. Blue Cross and Blue Shield of Kansas, supra; United States v. Dyba,*

554 F.2d 417 (10th Cir.), *cert. denied,* 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

(b)

■ Texaco argues that the trial court's *Allen* instruction, which virtually instructed the jury that a verdict must be reached, "appears to have had the effect of driving a dissenting juror off the jury." (Brief of Appellant, p. 64, n. 69). There is nothing in the record to support this assertion.

The jury foreman delivered a note to the court which the judge and counsel examined and discussed. The note explained that the jury foreman had been hospitalized about a year ago with a serious heart condition brought about as a result of stress caused by his job, resulting in early retirement. The note further explained that the juror had no idea at the outset of deliberations that he would be under the type of stress which caused his previous hospitalization. He referred the court to his doctor's letter which stated that the foreman had been recently examined and that he was suffering from "acute nervous reaction, hypertension and acute insomnia" and should be released from jury duty.

We agree with the district court's observation that under the circumstances, it would have been unconscionable to subject the jury foreman to further jury deliberation at the risk of aggravating his existing heart condition. In *Green v. Zant,* 715 F.2d 551, 555 (11th Cir.1983), the court held that "a federal district court possesses the discretion to remove a juror when that juror's capacity to perform his duties becomes impaired." Here, the district court had a sound factual basis upon which to exercise its discretion to remove the jury foreman and a hearing on the issue was not necessary.

V.

Texaco argues that the jury's findings of $9,025,000 actual damages and $25,000,000 punitive damages are excessive, and that the trial court abused its discretion in denying Texaco's motion for a new trial due to the excessiveness of the verdict. Our standard of review is that of abuse of discretion. *Garrick v. City and County of Denver, supra.*

Texaco contends that a review of the record will demonstrate to this court that passion, prejudice, corruption or other improper cause invaded the trial and that the jury award was so excessive as to shock the judicial conscience.

(a)

*Actual Damages*

■ With respect to the actual damages of $9,025,000 representing $5,025,000 for the wrongful death claim and $4,000,000 for Butch's survival claims, Texaco points out that Mason sought $3,500,000 under her wrongful death claim and that the jury's award exceeded that amount by $1,525,000. That award included the statutory maximum of $25,000 for bereavement and mental anguish. Of the remaining $5,000,000, a total of $1,315,561 was awarded for Butch's past and prospective lost earnings, medical expenses, nursing care and burial expenses. The balance of approximately $3,600,000 must be attributed to the economic value of the loss of services and care, which Texaco contends to be grossly excessive.

Texaco asserts that the $4,000,000 award for Butch's survival claims must be considered as compensation for pain and suffering which occurred between September, 1977, and Butch's death in December, 1979—a period of 27 months. Texaco also points out that Butch was in remission for approximately 15 of these months during which time he was able to work, travel and engage in most normal activities. Thus, while recognizing that Butch suffered physical pain and mental anguish during this period, Texaco argues that the $4,000,000 award is disproportionately large. Texaco contends that the magnitude of the award may be explained by the "[g]ross misconduct of plaintiff's counsel in closing, when, holding up a life expectancy chart, he told the jury to use the chart in determining actual damage.... The trial court recognized this was error, but refused to

correct the matter because compensation for pain and suffering obviously presupposes that the person was alive and thus able to experience pain...." (Brief of Appellant, p. 68).

In *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir.1985), we referred to a time-honored principle:

> It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function. The trier of fact, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages pursuant to the court's instructions....

In our view, there was substantial evidence in the record to support the jury's award of compensatory damages. We affirm these awards substantially for the reasons set forth in *Mason*, 741 F.Supp. at 1513–14.

### (b)
### *Punitive Damages*

Texaco argues that the $25,000,000 punitive damage award is unprecedented in a personal injury accident case in Kansas or in the Tenth Circuit. (Appellant's Brief, n. 74, p. 69). Further, Texaco cites Kan.Stat. Ann. §§ 60–3701, 60–3702 (Supp.1989) for the rule that $5,000,000 is the maximum punitive damage award allowed in Kansas on a tort claim since 1987.

Texaco contends that allowing the jury to assess punitive damages under a standardless punitive damage instruction on the basis that Texaco's conduct was "malicious" or "reckless," when the evidence shows that Texaco complied with government and safety organization standards, deprived Texaco of the Due Process guarantees of the Fourteenth Amendment. (Brief of Appellant, pp. 70–72).

A recent opinion of the United States Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), held that a punitive damages award that was four times the amount of compensatory damages was not

wanting under the Due Process Clause of the Fourteenth Amendment for vagueness where the punitive damages instruction by the trial court advised the jury that: the purpose of punitive damages was not to compensate the plaintiff for any injury but to punish the defendant; an additional purpose was to protect the public by deterring the defendant and others from doing such wrong in the future; and it must take into consideration the character and the degree of the wrong as shown by the evidence and the necessity of preventing similar wrong. *Id.* at ——, 111 S.Ct. at 1043–44. Where properly instructed, as in the instant case, the Supreme Court reasoned that the jury would be enlightened as to the nature and purpose of punitive damages and that such instructions would reasonably accommodate a defendant's interest in rational decisionmaking and the state's interest in meaningful individualized assessment of appropriate deterrence and retribution. *Id.* See also *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1173 (10th Cir.1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983).

Texaco acknowledges that Kansas law on the imposition of punitive damages was properly and accurately stated in the trial court's instruction. (Brief of Appellant, p. 72). See *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987). Texaco nevertheless contends, just as was argued and contended in *Haslip, supra,* that the instruction is "[c]ontentless and hopelessly vague regarding (1) under what circumstances punishment is warranted, (2) the relative degree of punishment to be imposed, and (3) the range within which punishment might properly be imposed." (Brief of Appellant, p. 72). Texaco also argues that because the punitive damage result on retrial involved the same conduct that the jury found not to warrant any punitive damage award during the first trial, the clear inconsistency shows that Texaco was denied due process.

The trial court, in denying Texaco's motion for j.n.o.v. or, alternatively, for a new trial, carefully reviewed Kansas law applicable to the award of punitive damages and

the evidence supporting the jury's determination. The district court concluded:

> Considering all the evidence in light of the relevant factors, and giving the due deference required under Kansas law and the Seventh Amendment to the jury's determination of the amount necessary to punish and deter defendant and other manufacturers from such conduct in the future, the punitive award is not so excessive as to shock this court's judicial conscience. Thus, the court rejects defendant's contention that the punitive damage award was motivated by passion, prejudice or bias.

741 F.Supp. at 1517.

■ The trial court recognized that if a damages award is deemed to be excessive, but not the result of passion, prejudice or bias, the court may order a remittitur, and that such a decision rests within the sound discretion of the trial court. *Id.* at 1514–15. The trial court correctly cited and relied upon *Malandris, supra,* 703 F.2d at 1168; *K–B Trucking Co. v. Riss Int'l Corp., supra,* 763 F.2d at 1162; and *Garrick v. City and County of Denver, supra,* 652 F.2d at 971. *Id.*

In *Malandris, supra,* we concluded that the punitive damage award was excessive and unwarranted even though passion and prejudice did not affect the jury finding of liability. We stated that "[s]ince we conclude that there is only error in the size of the punitive award, the remedy of remittitur is appropriate." 703 F.2d at 1168. Thus, a new trial was not required. On that predicate, the court ordered a remittitur to reduce the punitive award from $3,000,000 to $1,000,000. The *Malandris* court observed:

> Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the appellate court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy.

*Id.*

■ The issue of whether there is sufficient evidence to justify punitive damages is a question of law, and our review is confined to the assessment of whether the plaintiff presented evidence sufficient that a reasonable person might conclude that the defendant acted in a punitive manner. *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1384 (10th Cir.1989); *Silkwood v. Kerr–McGee Corp.,* 769 F.2d 1451, 1456 (10th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986). We concur with the district court's finding/conclusion that there was sufficient evidence in this case to justify the jury in finding that Texaco "knowingly embarked upon a course of conduct dangerous to the public, motivated by private gain." *Mason,* 741 F.Supp. at 1516.

The trial court agreed with Texaco "[T]hat 25 million is indeed a staggering sum." *Id.* Even so, the court did not conclude, based on all of the evidence, that the punitive damage award was so excessive as to shock the court's judicial conscience or that the award was motivated by passion, prejudice or bias. *Id.* at 1517. We agree with the district court's finding that the award was not motivated by passion, prejudice or bias. In our view, however, the award was so excessive as to shock our judicial conscience.

The trial court cited to *Folks v. Kansas Power & Light Co.,* 243 Kan. 57, 755 P.2d 1319, 1336 (1988), wherein the Kansas Supreme Court identified the following as relevant factors in reviewing a jury's award of punitive damages:

> the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing it, the relative positions of the plaintiff and the defendant, the defendant's financial worth and the plaintiff's probable litigation expenses.

The trial court analyzed each of the above factors, together with the deterrent effect of the award and the ratio that the punitive damage award bears in relation to the compensatory damages award, *Mason,* 741 F.Supp. at 1515–17, and concluded that the jury performed the difficult balancing act of not allowing sympathy to overcome reason, and not allowing desire for result

to overcome justice. *Id.* at 1518. While we agree with the trial court's rejection of Texaco's contention that the punitive damage award was motivated by passion, prejudice or bias, *id.* at 1517, we cannot agree that the "staggering sum" of $25,000,000 does not shock the judicial conscience.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974), the Supreme Court pertinently observed that:

In most jurisdictions jury discretion over amounts awarded is limited only by the gentle rule that they may not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused.

In his concurring opinion in *Haslip, supra,* Associate Justice Kennedy wrote that inconsistency in jury results can be expected for at least two reasons:

First, the jury is empaneled to act as a decisionmaker in a single case, not as a more permanent body. As a necessary consequence of this case-to-case existence, juries may tend to reach disparate outcomes based on the same instructions. Second, the generality of the instructions may contribute to a certain lack of predictability. The law encompasses standards phrased at varying levels of generality ... the standard can be more abstract and general to give the adjudicator flexibility in resolving the dispute at hand.

These features of the jury system for assessing punitive damages discourage uniform results, but nonuniformity cannot be equated with constitutional infirmity.

— U.S. —— at ——, 111 S.Ct. 1032, at 1055.

We observe that: even though the evidence presented during the course of the second trial in the instant case may not have been "substantially similar" to that presented during the first trial, both trials consumed about four months; plaintiff Mason sought punitive damages of $8,000,000 and the court so instructed the jury (R., Vol. VI, Tab 485, Inst. No. 1); and Mason did not file a cross-appeal with this court from the jury's finding of no punitive damages in the first trial. Thus, the jury's determination in the first trial that no punitive damages should be awarded stands in stark contrast to the $25,000,000 in punitive damages awarded by the jury against Texaco following the second trial.

■ It is well settled that mere excessiveness in the amount of an award may be cured by a remittitur, whereas excessiveness which results from jury passion and prejudice may not be so cured. In that case, a new trial is required. *See Malandris, supra,* at 1177–78; *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1447 (10th Cir.1987); *Karns v. Emerson Electric Co.,* 817 F.2d 1452, 1460 (10th Cir. 1987); Fed.R.Civ.P. 59; 11 Wright and Miller, *Federal Practice and Procedure,* § 2820 (1973); J. Moore, *Moore's Federal Practice,* 6A ¶ 59.08(7) (1991).

We conclude that the $25,000,000 punitive damages award is excessive and beyond a reasonable punitive award under the law of Kansas. We find the award so excessive as to shock our judicial conscience. We do not, however, conclude that the jury's liability determinations were tainted.

Thus, we conclude that a remittitur must be entered reducing the punitive award by one-half to $12,500,000. Should plaintiff Mason decline to accept a reduced judgment, there should be a new trial on all issues.

We AFFIRM the trial court's judgment, provided that the plaintiff accepts a reduction in the punitive damage award to $12,-500,000. Therefore, we REMAND to the district court with directions to enter a remittitur order providing that if, within a reasonable time to be fixed by the district court, plaintiff accepts a reduction of the judgment reducing the punitive damages award from $25,000,000 to $12,500,000, then the judgment as so modified shall be final; otherwise, an order shall be entered granting a new trial on all issues.